[No. 79564-9.   En Banc.]
Argued January 17, 2008.   Decided May 15, 2008.

THE STATE OF WASHINGTON, *Respondent*, v. VIRGIL R. MONTGOMERY, *Petitioner*.

580

*Carol A. Elewski*, for petitioner.

*Steven J. Tucker, Prosecuting Attorney*, and *Mark E. Lindsey, Deputy*, for respondent.

¶1 CHAMBERS, J. — Virgil Montgomery challenges both his conviction for possession of pseudoephedrine with intent to manufacture methamphetamine and his standard range, 51-month sentence. Among other arguments, Montgomery asserts his trial was tainted by improper opinion testimony, an improper missing witness instruction, and improper argument about missing potential defense witnesses. We agree with Montgomery that the State's opinion testimony was improper, as was the missing witness argument and instruction. Although we find some of the error harmless, we agree that Montgomery was denied a fair trial. We reverse his conviction and remand for a new trial.

¶2 In courts of law, it is not uncommon for two sides to offer starkly contrasting versions of the same events. The State contends that two middle aged citizens approaching their golden years and with no prior serious criminal history embarked upon a criminal enterprise to manufacture methamphetamine. Although the two are hardly the modern day equivalent of Bonnie and Clyde, the State contends that there is sufficient evidence to support a verdict that Montgomery, age 60, and his partner in crime, Joyce Biby, age 63, possessed pseudoephedrine with the intent to manufacture methamphetamine.

¶3 Montgomery offers a completely different interpretation of the same events. Montgomery testified that he, an ordained minister, first met Biby around 15 years ago. The two fell out of contact before getting reacquainted in 2004 while volunteering together at a local food bank. Montgomery testified that he and Biby are not now and have never been romantically involved. According to Montgomery, Biby confided in him about her troubles with the Social Security Administration. She became so upset telling him of her upcoming mental health assessment that Montgomery offered to drive her the hour or so from their homes in Newport, Washington, and Oldtown, Idaho,[1] to the appointment in Spokane.

¶4 On June 23, 2004, the pair set off in a Geo Storm borrowed from Biby's son-in-law. According to Montgomery, when Biby finished her appointment, she was extremely upset and could not drive. The two decided to do some shopping before returning home.

¶5 They first went to a large grocery, where Montgomery bought some matches for his wood stove and his son's cigarettes. Montgomery's 33-year-old son has been disabled by a stroke. Montgomery no longer works as a minister

---

[1] Newport and Oldtown are for all practical purposes one small town, divided only by the state line running through it. Montgomery lives on the Idaho side, and Biby lives on the outskirts of Newport on the Washington side. Because Newport and Oldtown is a rather small and remote community, locals often drive to Spokane to shop.

because he is the primary caregiver for both his son and his 14-year-old grandson. The next stop was the cold medicine aisle at a Target store in the Spokane Valley, which, unfortunately for Montgomery and Biby, was under police surveillance.[2]

¶6 They attracted the attention of police who were watching from a video room, because upon entering the store, Montgomery and Biby made an immediate right turn and went directly to the cold medicine. Police saw Montgomery point to particular brands and select two boxes of Target brand cold medicine containing the decongestant pseudoephedrine. The two then shopped and paid for their purchases separately, choosing separate check-out lines, Montgomery testified, to get through more quickly. Montgomery finished first and waited for Biby in the front of the store. Montgomery also testified that he did not know Biby had later returned and selected two boxes of the same cold medicine he had bought.

¶7 Police followed Montgomery and Biby to the Dollar Store, where Montgomery bought reading glasses. Biby paid the dollar for the glasses, and Montgomery reimbursed her immediately. Next door to the Dollar Store was a Rosauers grocery, where Montgomery bought one box of Sudafed brand cold medicine for his son, who, Montgomery testified, cannot take the generic brand purchased at Target because of other medications his son takes. Again, he and Biby shopped separately, and, Montgomery testified, he was unaware that Biby bought three boxes of matches.

¶8 Police then followed them to a Kmart store, where they compared prices but bought nothing. Next, at a Wal-Mart store, Montgomery bought a gallon of acetone. According to Montgomery, he lives in a rented trailer and has an agreement with the landlord to fix it up. The tiles on the floor are peeling up at the corners, and the can of acetone

---

[2] Making methamphetamine requires ephedrine or pseudoephedrine (found in common cold medications such as Sudafed), red phosphorus (found in the striking surfaces on matchbooks and extracted using acetone), a solvent such as denatured or isopropyl alcohol, iodine (which can be extracted from commonly sold tinctures of iodine using hydrogen peroxide), lye, and hydrochloric or muriatic acid.

that the landlord had left to remove them with was nearly empty. Biby, shopping separately, bought two cans of denatured alcohol.

¶9 Partly because it was a hot day and the car had no air-conditioning, Montgomery testified, on their way out of town he and Biby stopped at a second Target on the north side of Spokane. They went to the cold medicine aisle to compare prices, Montgomery explained. While he shopped, Biby bought two boxes of the cold medicine he had indicated. Montgomery bought a large bottle of hydrogen peroxide because, he said, his dog had recently cut itself badly on the metal skirting surrounding his dilapidated trailer.

¶10 Shortly after the last shopping stop at Target, the pair stopped so that Biby could stretch her legs under a large shade tree. When they returned to the highway, police pulled them over, arrested them, and searched the car.[3] Montgomery and Biby were charged with possession of pseudoephedrine with intent to manufacture methamphetamine. Only Montgomery's case is before us.

## SUFFICIENCY OF THE EVIDENCE

¶11 Montgomery challenges the sufficiency of the evidence supporting his conviction. Evidence is sufficient to support a jury's verdict if a rational person viewing the evidence in the light most favorable to the State could find each element beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). A conviction for possession of pseudoephedrine with intent to manufacture methamphetamine survives a sufficiency challenge if there is at least one other factor supporting intent beyond mere possession of the pseudoephedrine. *State v. Brockob*, 159 Wn.2d 311, 337, 150 P.3d 59 (2006) (citing *State v. Moles*, 130 Wn. App. 461, 466, 123 P.3d 132 (2005)). Evidence has

---

[3] Under the seat in the car, police found an old pipe used for smoking crack cocaine or methamphetamine. No charges resulted from the discovery of the pipe, presumably because the car belonged to Biby's son-in-law. The pipe, as well as the fact that nothing linked it to Montgomery, was discussed at trial.

been found sufficient where the defendant worked in concert with another person to acquire the pseudoephedrine or possessed one other "distinctive ingredient" of methamphetamine. *See Brockob*, 159 Wn.2d at 337; *State v. Missieur*, 140 Wn. App. 181, 189, 165 P.3d 381 (2007).

¶12 All told, Montgomery had purchased five boxes of matches, two boxes of Target brand cold medicine, one box of Sudafed, one gallon of acetone, and a large bottle of hydrogen peroxide. Biby had purchased four boxes of Target brand cold medicine, a pair of reading glasses, three boxes of matches, and two cans of denatured alcohol. Montgomery and Biby had bought five of the nine necessary ingredients to manufacture methamphetamine, entered stores together and split up to buy the ingredients, bought unusually large quantities of acetone and hydrogen peroxide, and went from one store to the next, buying potential ingredients at nearly every stop.

¶13 Even if the two were not working together, Montgomery alone bought pseudoephedrine cold medication as well as a gallon of acetone and a large bottle of hydrogen peroxide, two other "distinctive ingredients." *See Missieur*, 140 Wn. App. at 189. Montgomery's innocent explanations for his purchases were appropriate jury arguments, but the jury was not required to believe them. *See Brockob*, 159 Wn.2d at 340-41 (when evidence supports both innocent and criminal explanation, jury is entitled to infer guilt). We conclude there was sufficient evidence to support Montgomery's conviction.

## OPINION TESTIMONY

¶14 At Montgomery's trial, the detectives who followed him and Biby from store to store testified, as did a forensic chemist. Montgomery argues their statements regarding his intent amounted to improper opinion testimony on guilt. Detective Knechtel testified first. After the detective had described the events, the prosecutor asked whether he had formed any conclusions. The detective replied, "I felt

very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes. I'd seen those actions several times before." Report of Proceedings (RP) at 40. The prosecutor later asked, "Why . . . would you come to the conclusion that this was possession of that pseudoephedrine with intent to manufacture methamphetamine?" RP at 73. The court sustained Montgomery's objection that this question went to the ultimate legal question in the case, and the detective did not answer. Defense counsel cross-examined the detective, asking, "this is an assumption on your part that this is intent, correct?" RP at 105.

¶15 The prosecutor asked Detective Blashill why he had not stopped Montgomery and Biby sooner if he was suspicious almost from the beginning of the shopping trip. Blashill responded, "It's always our hope that if the person buying these chemicals, that are for what we believe to be methamphetamine production, that we can take them back to the actual lab location." RP at 116. On redirect, the prosecutor asked Blashill not to speculate but to just answer based on his training and experience, and Blashill responded, "That those items were purchased for manufacturing." RP at 135. There was no objection to either of these statements.

¶16 The forensic chemist testified primarily about the necessary ingredients for making methamphetamine and the commonly available products from which those chemicals can be obtained. RP at 145-46. On redirect by the State, the chemist surveyed the combined purchases of Biby and Montgomery and testified, "these are all what lead me toward this pseudoephedrine is possessed with intent." RP at 160. Defense counsel did not object. On cross-examination, the chemist conceded he would not be able to come to a conclusion based on Montgomery's purchases alone. He also agreed when defense counsel asked, "this is an assumption on your part that this is intent, correct?" and

"determining what a person's intent is, based on what we see, without knowing anything about them, we're making some assumptions, correct?" RP at 105, 161.

¶17 In this case, we are yet again asked to decide how far the State's witnesses may go in expressing opinions. *See, e.g., State v. Yates,* 161 Wn.2d 714, 763, 168 P.3d 359 (2007), *petition for cert. filed,* No. 07-10069 (U.S. Mar. 20, 2008); *State v. Mason,* 160 Wn.2d 910, 932, 162 P.3d 396 (2007); *State v. Kronich,* 160 Wn.2d 893, 903-04, 161 P.3d 982 (2007); *State v. Kirkman,* 159 Wn.2d 918, 937, 155 P.3d 125 (2007); *State v. Read,* 147 Wn.2d 238, 244, 53 P.3d 26 (2002); *State v. Demery,* 144 Wn.2d 753, 759, 30 P.3d 1278 (2001).

¶18 The concept of the jury as the arbiter of disputed facts appears to predate recorded history. Ancient Greek tradition credits Athena, the goddess of wisdom, with convening the first jury. LLOYD E. MOORE, THE JURY: TOOL OF KINGS, PALLADIUM[4] OF LIBERTY 1 (1973). But 750 years before the mythological trial of Orestes, recounted by Greek playwright Aeschylus, the Egyptian New Kingdom was already resolving minor disputes among workers on the necropolises using a "Kenbet," a council of eight members, four from each side of the Nile. *Id.* at 4.

¶19 More recently, the common law attempted to protect the role and the province of the jury by prohibiting opinion testimony on ultimate issues in the case. *United States v. Spaulding,* 293 U.S. 498, 507, 55 S. Ct. 273, 79 L. Ed. 617 (1935). One commentator has suggested that, at ancient common law, opinion testimony was never discussed because "it never occurred to the courts to allow such a thing." Ric Simmons, *Conquering the Province of the Jury: Expert Testimony and the Professionalization of Fact-Finding,* 74 U. CIN. L. REV. 1013, 1016 (2006).

---

[4] *The Federalist* papers describe the jury trial as " 'the very palladium of free government.' " WILLIAM L. DWYER, IN THE HANDS OF THE PEOPLE 1 (2002) (quoting THE FEDERALIST No. 83 (Alexander Hamilton)). The word "palladium" is defined as "a statute of Pallas Athena believed to protect Troy . . . . 1. A sacred object having the power to preserve or protect a city or state possessing it. 2. A safeguard, esp. one viewed as a guarantee of the integrity of social institutions." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 847 (1984).

■ ■ ¶20 The role of the jury is to be held "inviolate" under Washington's constitution. Wash. Const. art. I, §§ 21, 22; U.S. Const. amend. VII. The right to have factual questions decided by the jury is crucial to the right to trial by jury. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656, 771 P.2d 711 (1989). To the jury is consigned under the constitution "the ultimate power to weigh the evidence and determine the facts." *James v. Robeck*, 79 Wn.2d 864, 869, 490 P.2d 878 (1971). In virtually every jury trial, the jury itself is instructed that "[i]t is your duty to determine which facts have been proved in this case from the evidence produced in court." 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 1.02, at 9 (2d ed. 1994) (WPIC).

¶21 But during the 18th century, the need for skilled witnesses to help resolve technical questions began to conflict with the traditional requirement that witnesses testify only from personal knowledge and refrain from expressing opinions. Simmons, *supra*, at 1016-17. As the prohibition on opinion testimony on the ultimate issue became unworkable, and the distinctions between ultimate factual issues and nonultimate issues became more spurious, jurisdictions began to reject this rule and adopt some version of Federal Rule of Evidence 704, stating that a witness, whether lay or expert, may state an opinion as to the ultimate issue to be decided by the trier of fact. Simmons, *supra*, at 1023-25.

■ ¶22 In Washington, experts are permitted to testify on subjects that are not within the understanding of the average person. ER 702; *see also State v. Petrich*, 101 Wn.2d 566, 575-76, 683 P.2d 173 (1984). We allow experts to express opinions concerning their fields of expertise when those opinions will assist the trier of fact. ER 702; ER 701. The mere fact that an expert opinion covers an issue that the jury has to pass upon does not call for automatic exclusion. *Kirkman*, 159 Wn.2d at 929; *State v. Ring*, 54 Wn.2d 250, 255, 339 P.2d 461 (1959).

¶23 Lay witnesses also may now give opinions or inferences based upon rational perceptions that help the jury understand the witness's testimony and that are not based upon scientific or specialized knowledge. ER 701. A lay person's observation of intoxication is an example of a permissible lay opinion. *City of Seattle v. Heatley*, 70 Wn. App. 573, 580, 854 P.2d 658 (1993). But the advisory committee to Federal Rule of Evidence 702 explained that witnesses should not tell the jury what result to reach and that opinion testimony should be avoided if the information can be presented in such a way that the jury can draw its own conclusions. FED. R. EVID. 702 advisory committee notes ("[I]t seems wise to recognize that opinions are not indispensable and to encourage the use of expert testimony in non-opinion form when counsel believes the trier can itself draw the requisite inference.").

¶24 Before opinion testimony is offered, the trial court must determine its admissibility. In determining whether such statements are impermissible opinion testimony, the court will consider the circumstances of the case, including the following factors: "(1) 'the type of witness involved,' (2) 'the specific nature of the testimony,' (3) 'the nature of the charges,' (4) 'the type of defense, and' (5) 'the other evidence before the trier of fact.' " *Demery*, 144 Wn.2d at 759 (quoting *Heatley*, 70 Wn. App. at 579); *Kirkman*, 159 Wn.2d at 928.

¶25 However, this court has held that there are some areas that are clearly inappropriate for opinion testimony in criminal trials. Among these are opinions, particularly expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses.[5] *Demery*, 144 Wn.2d at 759; *Kirkman*, 159 Wn.2d at 927; *State v. Farr-Lenzini*, 93 Wn. App. 453, 463, 970 P.2d 313 (1999).

---

[5] This rule is well grounded in the rules of evidence. Testimony that tells the jury which result to reach is likely not helpful to the jury (as required by ER 702), is probably outside the witness's area of expertise (in violation of ER 703), and is likely to be unfairly prejudicial (in violation of ER 403).

¶26 In order to assure evidence is admitted in an orderly fashion and impermissible opinions are not improperly injected into the trial, certain procedures must be followed by trial advocates to lay proper foundations for opinion testimony. It is the duty of every trial advocate to prepare witnesses for trial. *See State v. Underwood*, 281 N.W.2d 337, 342 (Minn. 1979) (prosecutor has duty to prepare State's witnesses for trial). The preparation will vary depending upon the nature of the trial, the issue, and the type of witness.[6] In normal conversation, people often use phrases like "I believe" or "it's possible." These phrases are likely to draw objections at trial because witnesses are generally not permitted to speculate or express their personal beliefs about the defendant's guilt or innocence. *See, e.g., Bellevue Plaza, Inc. v. City of Bellevue*, 121 Wn.2d 397, 417, 851 P.2d 662 (1993); *State v. McDonald*, 98 Wn.2d 521, 529, 656 P.2d 1043 (1983); *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). Witness preparation facilitates the smooth and orderly presentation of evidence and the efficient administration of justice. At a minimum, trial advocates must explain to witnesses the decorum of a courtroom, the difference between direct and cross-examination, any orders in limine entered by the court, and the rules against speculation or expression of personal beliefs or opinions unless specifically requested.

¶27 It is unnecessary for a witness to express belief that certain facts or findings lead to a conclusion of guilt. To avoid inviting witnesses to express their personal beliefs, one permissible and perhaps preferred way is for trial counsel to phrase the question "is it consistent with" instead of "do you believe." For example, experts are often asked if a history given is "consistent" with clinical findings

---

[6] From the record, we are struck that neither the State's attorney nor three seasoned witnesses made any effort to avoid expressing their opinions that Mr. Montgomery possessed pseudoephedrine with the intent to manufacture methamphetamine.

or if certain assumptions are "consistent" with a conclusion. This court approved this form of question in *Kirkman*.[7]

¶28 It is also the duty of every trial advocate not to intentionally introduce prejudicial inadmissible evidence in a manner that denies an opponent the opportunity to object and the trial court the opportunity to rule on the objection. *See* RPC 3.4(e) (attorney must not allude to inadmissible evidence); RPC 3.2 (attorney must make reasonable efforts to expedite litigation). Occasionally issues arise, such as the foundation of an opinion, which must be explored outside the presence of the jury. Because the admission of an opinion is the exception to the general rule, one permissible, and perhaps preferred, way for the opinion to be offered is for the trial attorney to ask the witness if the witness has an opinion on a subject and instruct the witness to answer either, "Yes, I have an opinion" or, "No, I do not have an opinion." Having established that the witness has an opinion, the trial attorney may ask for the opinion. This tried and proven procedure assures that (1) the witness will not inappropriately blurt out an inadmissible opinion, (2) opposing counsel will have an opportunity to state any objection, and (3) the court will rule on the objection before the witness offers the opinion. Any party concerned about

---

[7] *Kirkman* was a child rape case. Because the physical evidence failed to show evidence of rape,

> the State asked Dr. Stirling, "Do you have an opinion with medical certainty whether the findings you observed are consistent with the history of abuse you were given?" 2B RP at 251. Dr. Stirling stated, "I would say the findings—to have no findings after receiving a history like that is actually the norm rather than the exception." *Id.* at 252. He went on to say, "I would be very surprised if her assailant were able to actually insert his penis into her vagina." *Id.* at 255.

*Kirkman*, 159 Wn.2d at 931-32. We concluded:

> Dr. Stirling did not come close to testifying on any ultimate fact. He never opined that Candia was guilty, nor did he opine that C.M.D. was molested or that he believed C.M.D.'s account to be true. Dr. Stirling testified only that he was able to communicate with C.M.D. because she "had good language skills for her age, she spoke clearly," 2B RP at 244. His testimony was content neutral, focusing upon the clear communication, rather than the substance of matters discussed. The doctor's testimony did not constitute manifest error.

*Id.* at 933.

opinion testimony may seek an order in limine requiring a like or similar procedure.

¶29 This procedure[8] could have prevented the challenge we now consider: whether the State's witnesses' testimony amounted to improper opinions on guilt. We believe it did. First, the opinions in this case went to the core issue and the only disputed element, Montgomery's intent. *See Farr-Lenzini*, 93 Wn. App. at 462-63 (in prosecution for attempting to elude, officer's testimony that defendant was trying to get away was improper opinion on guilt).

¶30 Opinions on guilt are improper whether direct or by inference, but it is very troubling that the testimony in this case was quite direct and used explicit expressions of personal belief such as "I felt very strongly that . . ." and "we believe." RP at 40, 116; *see Kirkman*, 159 Wn.2d at 936-37. The chemist also parroted the legal standard, as he stated, "These are all what lead me toward this pseudoephedrine is possessed with intent." RP at 160; *see Heatley*, 70 Wn. App. at 581 (opinion more troubling if stated in conclusory terms parroting the legal standard); *see also* RCW 69.50.440(1) (defining legal standard, "[i]t is unlawful for any person to

---

[8] We do not prejudge any questions or answers in any given case but suggest that an inquiry along the following lines would have permitted more orderly objections, rulings, and admission of evidence. Applying the principles outlined above, if a detective were qualified as an expert in methamphetamine manufacturing, the following colloquy could have occurred:

> Prosecutor: Detective, based upon your background and experience, do you have an opinion as to whether the chemicals possessed by Mr. Montgomery and the manner in which they were obtained is consistent or inconsistent with intent to manufacture methamphetamine? Please answer, "Yes I have an opinion," or "No, I do not have an opinion."
> Detective: Yes, I have an opinion.
> Prosecutor: What is that opinion?
> Detective: The chemicals possessed and the manner in which they were obtained was consistent with intent to manufacture methamphetamine.
> Prosecutor: Would you explain to the jury the bases for your opinion?

This approach permits the defense to timely state objections and the court to rule on the admissibility of evidence. It permits the detective to explain why the evidence is consistent with intent to manufacture without expressing an opinion as to the guilt or innocence of the accused. Finally, it permits the jury to perform its proper function.

possess ephedrine or . . . pseudoephedrine . . . with intent to manufacture methamphetamine . . . .").

¶31 Finally, the police officers' testimony carries an "aura of reliability." *Demery*, 144 Wn.2d at 765. But police officers' opinions on guilt have low probative value because their area of expertise is in determining when an arrest is justified, not in determining when there is guilt beyond a reasonable doubt. *See* Deon J. Nossel, Note, *The Admissibility of Ultimate Issue Expert Testimony by Law Enforcement Officers in Criminal Trials*, 93 COLUM. L. REV. 231, 244 n.70 (1993) (" 'Once [the expert] had testified as to the likely drug transaction-related significance of each piece of physical evidence, the jury was competent to draw its own conclusion as to [the defendant's] involvement in the distribution of cocaine.' " (alterations in original) (quoting *United States v. Boissoneault*, 926 F.2d 230, 233 (2d Cir. 1991))).

¶32 The State argues the officers' opinions added nothing new because the jury already knows the defendant was arrested because the officers believed he was guilty. We believe this unavoidable state of affairs does not justify allowing explicit opinions on intent. The opinion testimony in this case was improper.

¶33 Montgomery argues he may challenge this opinion testimony for the first time on appeal because it was manifest error affecting a constitutional right. *See* RAP 2.5(a)(3). This exception is a narrow one, and we have found constitutional error to be manifest only when the error caused actual prejudice or practical and identifiable consequences. *Kirkman*, 159 Wn.2d at 934-35.

¶34 Important to the determination of whether opinion testimony prejudices the defendant is whether the jury was properly instructed. *See id.* at 937. In *Kirkman*, this court concluded there was no prejudice in large part because, despite the allegedly improper opinion testimony on witness credibility, the jury was properly instructed that jurors " 'are the sole judges of the credibility of witnesses,' " and that jurors " 'are not bound' " by expert witness opin-

ions. *Id.* (quoting clerk's papers). Virtually identical instructions were given in this case. RP at 224, 226. There was no written jury inquiry or other evidence that the jury was unfairly influenced, and we should presume the jury followed the court's instructions absent evidence to the contrary. *See Kirkman*, 159 Wn.2d at 928.

¶35 Finally, we note that when Montgomery did object to a question posed to Detective Knechtel, because the question went to the ultimate legal question, the court sustained the objection and the detective did not answer. Had Montgomery raised objections, it seems likely they too would have been sustained and curative instructions given if requested. The record does not establish actual prejudice.[9] *See id.* at 937.

## MISSING WITNESS INSTRUCTION

¶36 The prosecutor also questioned Montgomery extensively about the whereabouts of his son and grandson and their ability to corroborate Montgomery's explanations of his purchases. Montgomery responded that his son was not competent to testify due to his stroke and his grandson, age 14, was in school. Montgomery's daughter, a reserve deputy sheriff for Bonner County, Idaho, testified as a rebuttal witness for the defense. She testified that Montgomery's son was not competent and his grandson was in school. She also testified that the dog was injured and the trailer was in bad repair.

¶37 After both sides had rested, the State requested a "missing witness" jury instruction, arguing that the son and grandson, as well as Montgomery's landlord, were natural witnesses for Montgomery to call, and the jury should be able to infer from their absence that their testimony would

---

[9] We note that if there were evidence that these improper opinions influenced the jury's verdict, we would not hesitate to find actual prejudice and manifest constitutional error regardless of the failure to object or the likelihood that an objection would have been sustained.

have been unfavorable.[10] Eventually, the State conceded that the son was not a natural witness due to his stroke, but the court granted the instruction as to the grandson and the landlord. During closing argument, the prosecutor repeatedly referred to the defense's failure to call the grandson and the landlord to corroborate Montgomery's explanations for the items he bought.[11]

¶38 We review a trial court's rulings on improper prosecutorial argument for abuse of discretion. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). Discretion is abused if the trial court's " 'decision is manifestly unreasonable or is based on untenable reasons or grounds.' " *Mason*, 160 Wn.2d at 922 (quoting *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003)). However, whether legal error in jury instructions could have misled the jury is a question of law, which we review de novo. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995); *Stevens v. Gordon*, 118 Wn. App. 43, 53, 74 P.3d 653 (2003).

¶39 A criminal defendant has no burden to present evidence, and it is error for the State to suggest otherwise. *Cheatam*, 150 Wn.2d at 652; *see also State v. Blair*, 117

---

[10] The instruction reads in full:

> If a party does not produce the testimony of a witness who is within the control of or peculiarly available to that party and is [sic] a matter of reasonable probability, it appears naturally in the interest of the party to produce the witness, and if the party fails to satisfactorily explain why it has not called the witness, you may infer that the testimony that the witness would have given would have been unfavorable to the party, if you believe such inference is warranted under all the circumstances of the case.

RP at 227; *see also* WPIC 5.20 (setting forth substantially the same language). We cite to the verbatim report of proceedings and the WPIC because the parties did not designate that the jury instructions be made part of the record.

[11] The prosecutor made no less than seven references to missing witnesses in closing argument. On one occasion, the prosecutor argued:

> "I have kids, and if I were in trouble, if I were on trial, and my kid told me -- my kid is quite a bit older than that -- said, well, gee, dad, I got to work that day, what do you think about that? Is that reasonable to you? Is that a reasonable explanation? If my son were on trial and I knew something, if I could corroborate something for him, do you think you could keep me away from a courtroom? Keep you away from a courtroom if you had testimony that would help him?"

RP at 239.

Wn.2d 479, 491, 816 P.2d 718 (1991).[12] However, under the missing witness doctrine, the defendant's theory of the case is subject to the same scrutiny as the State's. *State v. Contreras*, 57 Wn. App. 471, 476, 788 P.2d 1114 (1990). The State may point out the absence of a "natural witness" when it appears reasonable that the witness is under the defendant's control or peculiarly available to the defendant and the defendant would not have failed to produce the witness unless the testimony were unfavorable. *Blair*, 117 Wn.2d at 485-86. The State may then argue, and the jury may infer, that the absent witness's testimony would have been unfavorable to the defendant. *Id.* Over Montgomery's standing objection, the court allowed the prosecutor to argue that Montgomery's grandson and landlord would have given unfavorable testimony and gave a jury instruction to that effect.

¶40 We have previously found the limitations on the missing witness doctrine are particularly important when, as here, the doctrine is applied against a criminal defendant. *Id.* at 488. First, the doctrine applies only if the potential testimony is material and not cumulative. *Id.* at 489. Second, the doctrine applies only if the missing witness is particularly under the control of the defendant rather

---

[12] In *Blair*, 117 Wn.2d at 482-83, the police found what appeared to be a ledger relating to drug transactions. The defendant claimed the list of first names and phone numbers represented loans and gambling debts from card games. *Id.* at 483. The prosecutor commented that only one person on the list testified and argued that if the others would have corroborated the defendant's explanation, they would have testified as well. *Id.* In finding that the missing witness doctrine was properly applied, the court relied on the fact that the people on the list were particularly available to the defendant. *Id.* at 490. He testified he could have located them and the State would have had much difficulty in doing so because they were listed by first name only. *Id.* The defendant's own testimony established "unequivocally" that the absent persons could have corroborated his story. *Id.* at 487. Also in *State v. Contreras*, 57 Wn. App. 471, 788 P.2d 1114 (1990), the court held that a missing witness argument was warranted because the witness had both a special relationship to the defendant and material information. In that case, the defendant's alibi was that he spent the entire night with his girl friend and they ran into some acquaintances on a couple of occasions during the night. *Id.* at 472-73. The acquaintances testified, but the girl friend did not. *Id.* The court found it permissible to argue that the girl friend's testimony would have been unfavorable because the defendant did not call her even though she was a key witness with a special relationship to the defendant. *Id.* at 475-76.

than being equally available to both parties. *Id.* at 488, 490. Third, the doctrine applies only if the witness's absence is not satisfactorily explained. *Id.* at 489. For example, if the witness is not competent or if testimony would incriminate the witness, the absence is explained and no instruction or argument is permitted. *Id.* at 489-90. Finally, the doctrine may not be applied if it would infringe on a criminal defendant's right to silence or shift the burden of proof. *Id.* at 491.

¶41 The potential corroboration by Montgomery's grandson and landlord can hardly be described as "key" testimony. *See Contreras*, 57 Wn. App. at 475-76. The grandson's testimony would likely have been cumulative. He would probably know whether the dog was injured and whether the trailer was in poor repair, but Montgomery's daughter had already corroborated this information. Montgomery's grandson is not akin to an alibi witness who fails to testify. At no point in his direct testimony did Montgomery assert as a defense that his grandson could corroborate that he purchased the acetone to repair the tiles. Instead, the prosecutor, on cross-examination, asked whether his grandson would know about it, and Montgomery answered that he would. Additionally, the grandson was 14 years old and in school at the time. His absence was adequately explained, and the missing witness instruction should not have been given.

¶42 The instruction was also inappropriate in regard to the landlord. There was no testimony that the landlord would know of the need for more acetone to remove the tiles. Nor was the landlord specifically under Montgomery's control; few tenants believe they control their landlords. Finally, the prosecutor first argued the landlord was missing only after both sides had rested, giving Montgomery no opportunity to explain the landlord's absence. The missing witness doctrine must be raised early enough in the proceedings to provide an opportunity for rebuttal or explanation. *Blair*, 117 Wn.2d at 489 (missing witness inference is inappropriate if witness's absence is satisfactorily explained).

¶43 An improper jury instruction may be harmless error so long as the jury is properly instructed on the State's burden. *State v. Frost*, 160 Wn.2d 765, 780, 161 P.3d 361 (2007). " 'An erroneous instruction is harmless if, from the record in [the] case, it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' Whether a flawed jury instruction is harmless error depends on the facts of a particular case." *State v. Carter*, 154 Wn.2d 71, 81, 109 P.3d 823 (2005) (alteration in original) (quoting *State v. Brown*, 147 Wn.2d 330, 332, 58 P.3d 889 (2002)).

¶44 Other states have approached the issue with particular care when the missing witness is a close family member. *Commonwealth v. Whiting*, 358 Pa. Super. 465, 474-75, 517 A.2d 1327 (1986) (harmful error to give improper missing witness instruction regarding defendant's wife); *United States v. Glenn*, 314 U.S. App. D.C. 202, 64 F.3d 706, 710 (1995) (harmful error to give improper missing witness instruction regarding defendant's brother; harmless as to unrelated codefendant). The jury was presented with two competing interpretations of the undisputed events of that day in June 2004 and of what those events indicated about Montgomery's intent. We cannot say that the missing witness instruction, in combination with the prosecutor's repeated references to the absence of Montgomery's grandson and landlord, was harmless.

¶45 Because we find that giving the missing witness instruction was reversible error, we find it unnecessary to reach Montgomery's other contentions. We need not and do not decide whether the sentencing court should have considered imposing a first time offender sentencing waiver rather than a standard range sentence because Montgomery was eligible for the waiver despite the fact that neither attorney brought it to the court's attention. Nor do we decide whether Montgomery's counsel was ineffective in (among other things) failing to request the first time offender waiver.

## CONCLUSION

¶46 Montgomery's conviction was supported by substantial evidence. Although it was error for the detectives and forensic chemist to give their opinions as to Montgomery's intent to manufacture, the error was not manifest. It was an abuse of discretion for the court to give a missing witness instruction under the facts of this case, and this error was not harmless. We do not reach Montgomery's contentions that the court should have considered a first time sentencing waiver and that he received ineffective assistance of counsel. We reverse and remand for further proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, SANDERS, OWENS, and STEPHENS, JJ., concur.

¶47 MADSEN, J. (concurring) — I write separately because, while the majority correctly states the law that applies to decide whether sufficient evidence supports the defendant's conviction, I am concerned that the majority's presentation of the facts does not conform to that standard. *See State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007); *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). Rather than stating the facts in the light most favorable to the State, for the most part the majority presents them from the defendant's perspective, leaving the impression that the court believes the jury verdict was wrong. Majority at 584-86. It is no more the court's province to offer an opinion on guilt than it is the province of witnesses to do so.

¶48 The majority opinion also unnecessarily reaches the defendant's challenges to opinion testimony. The law is clear that a witness cannot give an opinion on the guilt of the defendant because such evidence violates the defendant's right to a jury trial that includes the jury's independent determination of the facts. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007); *State v. Demery*, 144

Wn.2d 753, 759, 30 P.3d 1278 (2001). Since this case will be retried, we need not and should not reach the question whether the defendant's constitutional right was violated, particularly in light of defense counsel's failure to object to challenged testimony. It is to be hoped that on retrial the State will advise its witnesses not to give opinions on guilt. It is also to be hoped that if the witnesses fail to follow this advice, defense counsel will object to improper opinion testimony.

FAIRHURST, J., concurs with MADSEN, J.

¶49 J.M. JOHNSON, J. (concurring) — I concur with the holding of the majority but write separately on the application of the missing witness doctrine. Specifically, I would hold that allowing the missing witness instruction in regard to Virgil Montgomery's 14-year-old grandson was not error.[13]

¶50 The jury instruction at issue reads as follows:

> If a party does not produce the testimony of a witness who is within the control of or peculiarly available to that party and is [sic] a matter of reasonable probability, it appears naturally in the interest of the party to produce the witness, and if the party fails to satisfactorily explain why it has not called the witness, you may infer that the testimony that the witness would have given would have been unfavorable to the party, if you believe such inference is warranted under all the circumstances of the case.

Verbatim Report of Proceedings at 227; *see also* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.20, at 130 (2d ed. 1994).

¶51 We review a trial court's choice of jury instructions for abuse of discretion. *State v. Lucky,* 128 Wn.2d 727, 731,

---

[13] I agree with the majority that it was error to permit the missing witness instruction in regard to Montgomery's landlord. Although the prosecution did not learn of Montgomery's agreement with his landlord until trial, the landlord was not under Montgomery's control, as was his grandson who lived with him. Additionally, the prosecution first claimed in its closing argument that the landlord was missing, leaving Montgomery no opportunity to explain his absence.

912 P.2d 483 (1996), *overruled on other grounds by State v. Berlin,* 133 Wn.2d 541, 947 P.2d 700 (1997). While the majority recognizes this deferential standard, it fails to apply it. The record shows that the judge listened to counsel's extensive argument on the missing witness doctrine, read this court's decision in *Blair,*[14] and after much thought, decided to allow the instruction.

¶52 "The majority of jurisdictions permit the missing witness inference in criminal cases where the defense fails to call logical witnesses." *Blair,* 117 Wn.2d at 486 (listing cases from other jurisdictions upholding the missing witness instruction). The missing witness instruction may be given when four criteria are met: (1) the potential testimony must be material and not cumulative, (2) the missing witness must be particularly under the defendant's control rather than equally available to both parties, (3) the missing witness's absence must not be adequately explained, and (4) the inference must not infringe upon a criminal defendant's right to silence or shift the burden of proof. *Id.* at 488-91; majority at 598-99.

¶53 Montgomery's failure to call his grandson as a witness satisfied these criteria. The majority declares that his grandson's potential testimony "can hardly be described as 'key' testimony." Majority at 599. I disagree. Montgomery provided innocent explanations for each of the items he purchased: the hydrogen peroxide was for a dog's injured leg, the acetone was to remove floor tiles in the family home, the cold medicine was for his son and him, and the matches were for his son's cigarettes and for the home wood stove.

¶54 Montgomery testified his grandson could corroborate his innocent explanations for each item. Montgomery lived in a trailer with his son and grandson. His grandson could have testified about the turned up floor tiles, the wood stove, the injured dog, the smoking habits of his father, and even the two different types of cold medicine.

---

[14] *State v. Blair,* 117 Wn.2d 479, 486, 816 P.2d 718 (1991).

¶55 This testimony would not have been cumulative. Montgomery's daughter did not live in the home. Thus, she did not testify about the turned up tiles, the wood stove, the smoking habits of her brother, or the two types of cold medicine. She testified only about the dog's injured paw.[15]

¶56 Montgomery's grandson was particularly available to Montgomery.

> "For a witness to be 'available' to one party to an action, there must have been such a community of interest between the party and the witness, or the party must have so superior an opportunity for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that his testimony would have been damaging."

*Blair,* 117 Wn.2d at 490 (quoting *State v. Davis,* 73 Wn.2d 271, 277, 438 P.2d 185 (1968)). Montgomery and his grandson had "such a community of interest." They are close relatives. *See* Alan Stephens, Annotation, *Adverse Presumption or Inference Based on Party's Failure To Produce or Examine Family Member Other Than Spouse—Modern Cases,* 80 A.L.R.4TH 337, § 2[a], at 343 (1990) ("Family relationships are generally considered a significant factor rendering a witness available to a party for purposes of the missing witness rule . . . .").[16] They lived together, and Montgomery was responsible for his minor grandson's care.

¶57 Montgomery's grandson's absence was also not adequately explained. Although attending school is undoubtedly important, when your grandfather could be imprisoned

---

[15] Although the majority states that Montgomery's daughter testified that the trailer was in bad repair, her only testimony regarding the trailer was that the dog cut its leg on the tin skirting surrounding the trailer. She made no mention of the general condition of the trailer or the turned up floor tiles inside the trailer.

[16] Although the majority notes that "[o]ther states have approached the issue with particular care when the missing witness is a close family member," (majority at 600), "in cases involving the accused's failure to present testimony from a family member other than a spouse, the missing witness inference has been approved about twice as often as not." Stephens, *supra,* § 2[a], at 344.

for up to 10 years for a crime he did not commit,[17] it seems unreasonable *not* to miss a day of school to testify.

¶58 Lastly, the burden of proof was not improperly shifted. Reference to a defendant's failure to produce a witness is not an impermissible shifting of the burden of proof. *Blair,* 117 Wn.2d at 491. Here, both the trial court and the prosecutor instructed that it was the responsibility of the State to prove each element of the crime charged beyond a reasonable doubt and that Montgomery had no burden of proof. *See State v. Lord,* 117 Wn.2d 829, 861, 822 P.2d 177 (1991) ("jury is presumed to have heeded the instructions of the court").[18]

¶59 As a final note, and most important, I believe the majority underestimates the ability of juries. " 'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.' " *People v. Carey*, 41 Cal. 4th 109, 130, 158 P.3d 743, 59 Cal. Rptr. 3d 172 (2007) (internal quotation marks omitted) (quoting *People v. Lewis*, 26 Cal. 4th 334, 390, 28 P.3d 34, 110 Cal. Rptr. 2d 272 (2001)). Two phrases in the "missing witness" jury instruction stand out: *"may infer"* and *"if . . . such inference is warranted under all circumstances of the case."* (Emphasis added.) The instruction did not *require* jurors to infer unfavorable testimony. It merely allowed them to do so if, after hearing all of the evidence, it was warranted.

¶60 Montgomery claimed his grandson could have corroborated his explanations for four or five of the drug ingredients he innocently purchased. His grandson did not testify, and his absence was not adequately explained. Allowing the missing witness instruction was not an abuse of discretion. I concur with the majority's reversal of these convictions.

FAIRHURST, J., concurs with J.M. JOHNSON, J.

---

[17] *See* RCW 69.50.440.

[18] The jury instruction obviously did not infringe upon Montgomery's right to silence because he waived this right and testified at trial.