FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 AUG -6 AM 8:30



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 76569-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CARLOS DANIEL HUAMAN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 6, 2018 |
| | ) | |

MANN, A.C.J. — Carlos Huaman appeals his convictions for assault in the fourth degree—domestic violence and interfering with domestic violence reporting. He contends that several State witnesses expressed their opinion as to his guilt and that the deputy prosecutor committed reversible misconduct during closing argument. But when their testimony is viewed in context, the witnesses did not express a personal belief that Huaman was guilty. Huaman's claim of prosecutorial misconduct fails because the challenged comments are either not misconduct or so minimally prejudicial that there is no likelihood they affected the jury's verdict. Accordingly, we affirm.

## FACTS

Shortly after midnight on October 23, 2016, the 9-1-1 operator answered a call and heard what sounded like a commotion on the line. A woman, later identified as Alexis Eaton, said "give me my phone right now." The operator heard a scream, and Eaton then said, "I'm calling cops . . . Give me the phone! Can you put my phone down?" At this point, the call was disconnected.

The operator called the cell phone number back and asked, "are you having an emergency?" Eaton replied, "Yes. I am" before the call was again disconnected.

The 9-1-1 operator determined that Eaton was the registered owner of the cell phone. Using signals from the cell phone, the operator also determined Eaton's approximate location near the Swiss House Apartments in Kirkland and dispatched officers.

Kirkland Police Officer Charles Bussey drove to the reported location and saw Eaton walking with her neighbor, James Slaght. Eaton flagged Bussey down, and he got out of his patrol car to talk to her. Eaton was shaking, stammering, and appeared to have been crying.

Eaton identified herself and told Bussey that her ex-boyfriend, Carlos Huaman, had broken into her apartment. She said that she had gone upstairs to her apartment to investigate a noise when she found Huaman inside. Huaman grabbed her by the leg and arm and threw her around the apartment. He then threw her to the ground when she tried to call 9-1-1 and tossed her cell phone away. At this point, Huaman jumped off the balcony and fled. Eaton went downstairs to get help from her neighbors, Slaght and Elliot Burke.

Bussey broadcast Huaman's description to the other officers in the area. Based on the description, Kirkland Police Officer Patrick Baxter detained Huaman, who was riding a bicycle a short distance away. After Eaton identified Huaman, Baxter arrested him. Bussey then brought Eaton back to her apartment, where she gave a written statement. Officers removed the cell phone that Huaman was carrying and returned it to Eaton.

In her statement, Eaton confirmed that Huaman had entered her apartment without permission. She found him in the bedroom "going through my stuff." Huaman threw her around the apartment and then onto the floor. Eaton described the pain as about level 8 on a scale of 1 to 10. Eaton eventually managed to escape and run downstairs to the neighbors' apartment. Eaton and Slaght then followed Huaman, who had fled with one of Eaton's cell phones. After catching up to Huaman, Slaght and Huaman scuffled, and Eaton managed to snatch back her cell phone before the police arrived.

Bussey smelled alcohol on Eaton's breath before she gave the statement. But he did not notice any signs of impairment, such as bloodshot, red, or watery eyes. Eaton had "great spatial awareness" and did not fumble while retrieving identification from her purse.

The trial court admitted Eaton's written statement at trial.

The State charged Huaman with burglary in the first degree—domestic violence, assault in the fourth degree—domestic violence, and interfering with domestic violence reporting.

At trial, Burke testified that he and his roommate Slaght lived in the apartment below Eaton's. Eaton would occasionally visit and "hang out."

Just after midnight on October 23, 2016, Burke heard a "scuffle upstairs," as though something might be "slamming into the ground." A short time later, Burke heard a knock on the door. When Slaght opened the door, Eaton burst into the apartment and appeared to be "[p]anicked and crying."

After stepping outside, Burke saw Huaman jump down from Eaton's balcony. Huaman called Eaton a "dumb bitch" and exchanged "a couple of 'fuck off's'" with Slaght before running off. Slaght and Eaton then pursued Huaman.

On October 24, 2016, Detective Allan O'Neill called Eaton and informed her that he had been assigned to the case. Several hours later, Eaton called back and expressed concern about getting Huaman out of jail.

Two days later, on October 26, Eaton called O'Neill and asked to meet with him to provide an additional statement. Eaton met with O'Neill on the following day and claimed that Huaman had permission to be in her apartment on the night of the charged incident and that he had never assaulted her. Eaton also explained that the cell phone officers had returned to her was Huaman's own cell phone.

Eaton testified that she met Huaman in a shelter in 2015. The two began dating in 2016 and became engaged in August 2016. Eaton was 19 at the time of trial. Although the Swiss House Apartments prohibited overnight guests, Eaton acknowledged that Huaman spent most nights in her apartment. Eaton was concerned that she could lose the apartment if the management caught her breaking the rules.

Eaton described her relationship with Huaman as "[s]adomasochistic," meaning that "[b]asically we hurt each other." Eaton maintained the relationship was "good" for her.

Eaton claimed that she spent the day before the charged incident visiting her mother in Everett. While returning on the bus, Eaton sent a text to Huaman suggesting she was cheating on him. Eaton denied that she found Huaman rummaging through her bedroom. Rather, upon arriving at her apartment, she found Huaman had been drinking. The two argued about the text and had sex. Eaton then decided she wanted to drink with Huaman.

After consuming two or three shots, Eaton went downstairs to the neighbors' apartment for some "fresh air." When Slaght and Burke asked Eaton to share the alcohol, Eaton went back upstairs to get the bottle. Huaman was sleeping, and Eaton tried to wake him up to find out where the alcohol was. After Huaman awoke, Eaton demanded the bottle. Huaman suddenly grabbed Eaton, and during the ensuing physical struggle, Eaton claimed that she hit her head on the side of the bed when she tried to pull herself away. Eaton denied that Huaman threw her to the floor. She maintained that she fell to the floor when she tried to punch Huaman and missed.

At one point, Eaton entered 9-1-1 on her cell phone and threatened to place the call if Huaman did not quiet down. Huaman then attempted to grab the phone. After the two fought over the phone, Eaton noted that the call had gone through. In an attempt to prevent her from leaving, Huaman grabbed Eaton and placed her on the couch. Eaton was eventually able to run downstairs to the neighbors' apartment. She acknowledged telling the 9-1-1 operator that she needed help.

Eaton claimed that she was by herself when she followed Huaman. After walking several blocks, she encountered Huaman and Slaght yelling at one another. After rejecting Huaman's offer to go with him, Eaton started walking back to her apartment as the police approached. Eaton denied flagging down the police and claimed that Slaght had flagged them down, even though she begged him not to.

Eaton suggested that she had been too intoxicated to give the written statement to Bussey. She acknowledged that she initially gave the police a "false statement," but insisted she was telling the truth at trial.

The jury acquitted Huaman of the burglary charge, but found him guilty as charged of assault in the fourth degree—domestic violence and interfering with domestic violence reporting. The court imposed a 137-day sentence.

## ANALYSIS

Huaman contends that improper opinion testimony and prosecutorial misconduct deprived him of his constitutional right to a fair trial. He argues that State witnesses repeatedly violated a pretrial order and invaded the province of the jury by expressing their personal belief that he was guilty. He claims that the deputy prosecutor committed reversible misconduct by reinforcing the improper opinion testimony during closing argument.

Opinion on Guilt

"Opinions on guilt are improper whether made directly or by inference." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). Such testimony may violate the defendant's constitutional right to a jury trial, which vests in the jury "the ultimate power to weigh the evidence and determine the facts." State v. Montgomery, 163 Wn.2d 577,

590, 183 P.3d 267 (2008) (quoting James v. Robeck, 79 Wn.2d 864, 869, 490 P.2d 878 (1971)). A law enforcement officer's improper opinion testimony may be particularly prejudicial because it carries "a special aura of reliability." State v. King, 167 Wn.2d 324, 331, 219 P.3d 642 (2009) (quoting State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007)).

When determining whether testimony constitutes an improper opinion on guilt, we necessarily consider the specific circumstances of each case, including "(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact." State v. Demery, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001) (quoting City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)). But the admission of an improper opinion without objection is not automatically reviewable as a "manifest" constitutional error. State v. Kirkman, 159 Wn.2d 918 at 936; see RAP 2.5(a)(3). "'Manifest error' requires a nearly explicit statement by the witness that the witness believed the accusing victim." Kirkman, 159 Wn.2d at 936. Washington courts have "declined to take an expansive view of claims that testimony constitutes an opinion on guilt." See Demery, 144 Wn.2d at 760.

Huaman asserts that several witnesses repeatedly expressed their personal belief that he had committed the charged crime. Officer Bussey, who was the first officer to respond to the 9-1-1 call, testified that the dispatcher informed him that "the victim and the suspect" had left the apartment and were headed toward a nearby 7-Eleven. Bussey also described the general procedure he follows as the first officer on the scene:

[A]s the first officer to arrive, I have to confirm that there has been a crime committed. Because we have other officers who are coming into the area who may encounter the possible suspect, and we need to have a crime and a victim. So that's my primary concern. At that time I confirmed that she was the one who called 9-1-1. I confirmed that what she was telling me constituted a crime. And I confirmed that she wished to be a victim.

(Emphasis added). Defense counsel did not object.

A short time later, Bussey explained how he notified the other responding officers who were looking for the suspect:

Q. What happened next after you obtained that information from Ms. Eaton?

A. As she's giving it to me, I immediately put out [two] officers that are on the road that I have a confirmed crime. First, I let them know that I had a confirmed assault DV, domestic violence. And then once I put that out she continued to tell me her story. She told me -- when she told me that she tried to call 9-1-1 and that Mr. Huaman had taken her phone from her and threw it. That constitutes a second crime of interfering with a 9-1-1 conforming to a DV.

Q. Okay. And what's the purpose of telling them that?

A. They're going to be coming in contact with – with a suspected suspect of a crime of a violent nature. I want to allow other officers to know that we have A) a crime, and B), a victim, and that if they were to encounter him, he -- he can be considered dangerous.

(Emphasis added.) Defense counsel raised no objection.

Detective O'Neill testified that he was assigned the case after a supervisor determined that in addition to involving criminal trespass and domestic violence assault, the case also "met the requisites for burglary," a "serious felony." Defense counsel did not object.

Huaman initially argues that the testimony of both Officer Bussey and Detective O'Neill violated the trial court's pretrial order. The record fails to support this claim.

Prior to trial, Huaman moved "to exclude improper opinion evidence." When the trial court asked about the specific basis for the motion, defense counsel explained that he was "just concerned if Officer Bussey or Detective O'Neill or somebody says well, this is how DV victims behave." But none of the State's witnesses purported to offer an opinion on how domestic violence victims behave. And in any event, when viewed in context, the officers' references to "crimes" did not their personal opinion on Huaman's guilt.

Huaman's reliance on State v. Montgomery is misplaced. In Montgomery, a prosecution for possession of pseudoephedrine with intent to manufacture methamphetamine, two detectives observed the defendants purchasing pseudoephedrine and other items. At trial, one of the detectives testified:

> I felt very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes. I'd seen those actions several times before.

Montgomery, 163 Wn.2d at 587-88. The second detective opined, "those items were purchased for manufacturing." Montgomery, 163 Wn.2d at 588. And after reviewing the necessary ingredients for making methamphetamine and the defendant's purchases, a forensic chemist added, "these are all what lead me toward this pseudoephedrine is possessed with intent." Montgomery, 163 Wn.2d at 588.

Our Supreme Court found that the testimony constituted improper opinions on the defendant's guilt, noting that the testimony involved "the core issue and the only

disputed element, Montgomery's intent." Montgomery, 163 Wn.2d at 594. The court concluded, however, that the testimony was not manifest constitutional error because the jurors were properly instructed that they were the "sole judges of credibility" and were not bound by expert witness opinions. Montgomery, 163 Wn.2d at 595.

Here, unlike the witnesses in Montgomery, Officer Bussey and Detective O'Neill did not offer direct and explicit expressions of personal belief about the defendant's commission of the charged crimes. Rather, their testimony was essentially contextual. Bussey's testimony involved his protocol for contacting the complaining witness and then advising the other officers about whether to detain the suspect. Bussey's explanation for confirming "crimes" was based solely on Eaton's allegations about what had happened, a circumstance that defense counsel emphasized during Bussey's cross-examination. Similarly, Detective O'Neill's brief references to a burglary and "serious felony" merely explained why he had been assigned to the case.

Neither Bussey nor O'Neill witnessed any of the charged conduct. Nor did they assert or imply a belief that Huaman was guilty of the crimes or that Eaton's allegations were credible. The fact that defense counsel did not object to the challenged testimony strongly suggests that he did not perceive it, in context, to be either in violation of the pretrial order or prejudicial. When Officer Baxter testified that Officer Bussey had advised him of "probable cause" and that "a crime had occurred," defense counsel promptly objected. The trial court sustained the objection and struck the testimony.

Moreover, as in Montgomery, the trial court properly instructed the jurors that they were the "sole judges of the credibility of each witness" and the "value or weight to be given to the testimony of each witness." See Montgomery, 163 Wn.2d at 595. In

-10-

addition, the court instructed the jury on its duty to decide the facts based on the evidence and to apply the law to the facts. We must presume that the jury followed these instructions. Montgomery, 163 Wn.2d at 596. As already noted, the jury acquitted Huaman of the burglary charge.

Under the circumstances, although the officers could have formulated the references to the "crime" more clearly, the challenged testimony did not reflect a personal belief in Huaman's guilt or constitute an improper opinion on guilt.

Reference to Victim

Huaman contends that the witnesses' references to Eaton as a "victim" also reflected their belief that he was guilty. Prior to trial, Huaman moved to exclude any references to Eaton as a "victim," arguing that the term is improper because it assumes that a crime has been committed and essentially constitutes an opinion on guilt. The trial court granted the motion, except for references to "victim" during voir dire, ruling that "[e]veryone will try their best not to refer to Ms. Eaton as a victim."

Officer Bussey used the term "victim" a total of six times during his testimony. Defense counsel objected to only one of the instances, and the deputy prosecutor admonished Bussey to refer to "the witness by her last name." Officer John Klein, one of the responding officers, initially referred to Eaton as "the victim." After defense counsel objected that Eaton was an "[a]lleged victim," Klein corrected himself to use Eaton's name. In a couple of instances, the deputy prosecutor also referred to Eaton as the "victim."

In granting the pretrial motion, the trial court clearly recognized that the particular meaning to be accorded the term "victim" depends on the context in which it is used, but

that its use may be questionable in some instances. The court also appears to have recognized that use of the witness's name or more neutral terms, such as "complainant" or "complaining witness" serves to reduce any potential misunderstanding or confusion.

But Huaman has not provided any meaningful legal argument addressing the specific references to "victim" in this case or demonstrating that the term reflected the witness's personal belief in his guilt or the credibility of Eaton's initial accounts to the police. Rather, when viewed in context, the officers and the deputy prosecutor appear to have used "victim" as the equivalent of "complainant" or "complaining witnesses." Under the circumstances, Huaman has failed to demonstrate any prejudice resulting from the relatively few violations of the trial court's pretrial order.

Huaman contends that the deputy prosecutor committed misconduct by not "inform[ing] her witnesses of the court's rulings" about the term "victim." Because this allegation rests on matters outside the record, we cannot consider it in a direct appeal. See State v. McFarland, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995) (the court will not review matters outside of the trial record on direct appeal).

Similarly, Huaman contends that the testifying officers "repeatedly discussed the fact that Mr. Huaman was in jail." He concedes that he did not move to exclude such references, but asserts that "they are of the same character as improper opinions on guilt." But he has not cited any relevant authority to support this conclusory allegation or presented any legal argument demonstrating that the references, when viewed in context, reflected the witnesses' personal belief that he was guilty of the charged crimes. We therefore decline to consider the issue. See Saunders v. Lloyd's of London, 113 Wn.2d 330, 345, 779 P.2d 249 (1989) (an appellate court will generally

decline to consider issues unsupported by cogent legal argument and citation to relevant authority). As this court noted in State v. Mullin-Coston, 115 Wn. App. 679, 692, 64 P.3d 40 (2003), aff'd, 152 Wn.2d 107, 95 P.3d 321 (2004), references to the defendant's pretrial custodial status do not automatically violate the right to a fair trial or the presumption of innocence. "Jurors must be expected to know that a person awaiting trial will often do so in custody." Mullin-Coston, 115 Wn. App. at 693 (evidence that the defendant was in jail during certain conversations he had with witnesses after his arrest did not violate right to fair trial or presumption of innocence).

Prosecutorial Misconduct

Huaman contends that the deputy prosecutor committed prosecutorial misconduct during closing argument by urging the jury to convict him based on evidence outside the record, by vouching for a State witness, and by appealing to the jury's passions and prejudices. We disagree.

A defendant claiming prosecutorial misconduct bears the burden of demonstrating that the challenged conduct was both improper and prejudicial. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). Prejudice occurs only if "there is a substantial likelihood the instances of misconduct affected the jury's verdict." State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995). We review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

During closing argument, the deputy prosecutor suggested that Eaton's own trial testimony established the assault and interference with domestic violence reporting and

that "the only real issue in this case . . . is whether or not the defendant entered or remained unlawfully in Ms. Eaton's apartment." The deputy prosecutor then proposed

> that the way you answer this question is two-fold. You -- number 1, answer by assessing the witness's testimony to discern it -- to determine what is credible. So we talked in the beginning about, you know, the types of evidence you'd see and hear. The main type of evidence you have, it's not a physical evidence case. There's not like fingerprints. There's not -- it's not that kind of case. It's not a CSI case. It's a case about testimony.
>
> And that doesn't make it weaker or stronger. It's just a different kind of evidence. It's all the same. There's nothing in there that tells you like, oh, testimony's not as good as like video surveillance. These are domestic violence crimes: crimes against family or household members. Of course they happen behind closed doors. They're not happening on video. They're not -- I mean, that's the nature of this. And if we couldn't go forward on these without simply testimony, we'd be in a world of hurt, right? And think about --
>
> DEFENSE COUNSEL: Objection, Your Honor. This is --
>
> THE COURT: Overruled.
>
> DEPUTY PROSECUTOR: We have cases all the time going on where we're going forward, you know, based purely on testimony. So it's not necessarily something bad. But you have to be able to assess it. Luckily the instructions help us.

(Emphasis added).

The deputy prosecutor continued with a lengthy argument about how to assess credibility.

Huaman contends that the comments improperly urged the jury to convict him based on unsupported generalizations about domestic violence. He also argues that the comments amounted to an emotional appeal that sought to reduce the State's

burden of proof and raise the jury's sympathy about the difficulties of convicting domestic violence perpetrators.

The deputy prosecutor's brief references to domestic violence cases were part of a lengthy, overarching review that focused the jury's attention on the specific evidence in this case and on the instructions. When her comments are viewed in context, the deputy prosecutor did not invite the jury to abandon the proper standard of proof or decide the case on emotional grounds. Moreover, even if there were some impropriety, there was no reasonable likelihood that the comments affected the verdict. See State v. Magers, 164 Wn.2d 174, 192, 189 P.3d 126 (2008) (prosecutor's comments about the "dynamics of domestic violence relationships" in relation to the total argument was not so egregious as to warrant reversal).

Huaman next contends that the deputy prosecutor improperly vouched for the credibility of Officer Bussey:

> So then he tells us, okay, we go back to the apartment, and I kind of look around. One thing that he testified really clearly about, and I -- I think he was the officer who had a number of years of past experience with law enforcement. But he was clearly articulate and -- like trained in observation --

DEFENSE COUNSEL: Objection, Your Honor. This is vouching.

THE COURT: Overruled.

DEPUTY PROSECUTOR: He was very observant. You could tell from his testimony. And he talked about smelling alcohol on Ms. Eaton. And he said, "I did smell alcohol on her. And at first I smelled it when we were at the scene and it was Mr. Slaght and Ms. Eaton standing together. And so I wasn't sure who it was coming from. But I was able to figure out it was coming from Ms. Eaton when I got her alone. Because of that, I observed her to make sure that she wasn't intoxicated.

(Emphasis added).

The prosecutor may not vouch for the credibility of a witness. State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). "Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." Thorgerson, 172 Wn.2d at 443. But the prosecutor may argue the credibility of a witness "based on reasonable inferences from the evidence." Thorgerson, 172 Wn.2d at 448.

Here the deputy prosecutor did not express a personal belief about credibility, but rather properly argued that inferences drawn from Officer Bussey's testimony suggested he was a credible witness. The issue was significant because Eaton had recanted her original statement and disputed Officer Bussey's account. The challenged comments fell within the wide latitude afforded the deputy prosecutor to draw and express reasonable inferences from the evidence and were therefore not improper. See State v. Stetson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

Finally, Huaman contends that the deputy prosecutor committed misconduct by urging the jury "to imagine what Ms. Eaton must have been thinking and feeling":

> She loves him. <u>And she is in a particularly vulnerable situation. She told you that she's a homeless youth. She met him in a homeless shelter. She has prior -- she knows what domestic violence is, she told us, because she's been in a prior DV relationship.</u>
>
> So imagine that the love that she feels when someone shows her some sort of love is a pretty powerful kind of love. Powerful enough that you don't want it to go away when you find that what happened is changing that relationship. It's making it so that you can't see your fiancé. You can't talk to them. They may get in trouble. She testified, "I told him that he would have to go back to Peru." We don't know all the repercussions, but that we do know that she was not happy as things started to calm down after this.

(Emphasis added). Huaman argues that the comments improperly appealed to the passions and prejudice of the jury and assumed facts not in evidence.

The challenged comments were part of the deputy prosecutor's attempt to explain Eaton's differing accounts, a challenge that both sides faced. The deputy prosecutor did not invite the jury to decide the issue on emotional grounds, but properly attempted to explain the recantation based on the circumstances that Eaton herself revealed. Such arguments fall within the proper scope of closing argument. See Stetson, 132 Wn.2d at 727.

Moreover, the defense raised no objection to the comments. When the defendant fails to object, we will not review the alleged error unless the defendant demonstrates that the misconduct was "so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct." State v. Belgarde, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). Even if part of the argument was improper, Huaman has failed to demonstrate why a curative instruction would not have cured any potential prejudice.

Huaman contends that even if no single error merits reversal, the cumulative effect of the errors deprived him of a fair trial. Because Huaman has not shown an accumulation of errors, the cumulative error doctrine does not apply. See In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835 (1994).

Affirmed.

_Mann, A.C.J_

WE CONCUR: