FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 SEP -4 AM 9: 30

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 76575-2-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| JOSEPH WILLIAM DAVENPORT, | ) ) | |
| Respondent. | ) ) | FILED: September 4, 2018 |

APPELWICK, C.J. — Davenport was convicted of two counts of first degree promoting prostitution, one count of first degree unlawful possession of a firearm, one count of possession with intent to manufacture or deliver methamphetamine, and one count of second degree assault – domestic violence. He contends that (1) a police officer gave improper opinion testimony on his guilt, (2) there was insufficient evidence to support one of his convictions for promoting prostitution, (3) the trial court erred in failing to order a competency evaluation, (4) the jury instructions failed to preserve jury unanimity and permitted a double jeopardy violation, and (5) his dual convictions for assault and promoting prostitution violate double jeopardy. We affirm.

## FACTS

Kayla Snow first met Joseph Davenport while she was walking along the highway, which she often did. They exchanged phone numbers and Snow, working as a prostitute, quickly started giving all her money to Davenport. Snow testified that Davenport beat her and held a gun to her head on the third day that

she knew him. After about a week, Davenport and Snow went to Eastern Washington where Snow continued to work as a prostitute. When they returned from Eastern Washington, after about two months, Davenport brought another woman, Jasmin McLain, into his "relationship" with Snow. McLain also worked as a prostitute for Davenport.

Snow testified about a specific time when Davenport hit her after she expressed jealousy over his relationship with McLain. Davenport hit Snow twice in her mouth with his gun. Afterward, he took her back to the hotel and punched her in her eye. Snow asked Davenport for medical care, but he first took Jasmin on a "call," leaving Snow bleeding in the backseat of his car. Hours later, on April 15, Davenport took Snow to the hospital, where they put multiple stitches in her mouth.

McLain introduced Davenport as her boyfriend to her mother, Danielle McLain.[1] On another visit, Danielle went to the hotel where Davenport, Jasmin, and Snow were staying. Weeks later, Jasmin asked Danielle for help to get away from Davenport. After Jasmin stayed with her mother for about a week she went back to Davenport. Jasmin also contacted her grandmother, Kristie Lund, for help. Lund picked up Jasmin and took her to a "safe house" for a local outreach organization. Lund noticed that Jasmin had bruising around her eye, lips, and nose. Jasmin left the facility and eventually returned to Davenport. At some point, Jasmin's mother, Danielle, contacted the National Human Trafficking Resource Center, which gave the tip to local police detectives.

---

[1] We use Danielle and Jasmin McLain's first names hereafter for clarity.

2

Using Jasmin's telephone number, Kent police officer Lovisa Dvorak found her prostitution advertisements online. Posing undercover as a potential client or buyer, Detective Brian Lewis contacted the number in the advertisement, and set up a "date" with Jasmin. A team of undercover officers staked out the Tukwila hotel where Detective Lewis arranged to meet Jasmin. While Detectives Dvorak and Lewis went to meet Jasmin in the motel room, the other officers detained Davenport in the parking lot. The officers obtained a search warrant to search Davenport's car. They found just over 20 grams of methamphetamine, a digital scale, and a gun.

Without knowing her identity or her connection to this case, police subsequently detained Snow for prostitution loitering on Pacific Highway South. Snow agreed to go to the police station, where she gave a recorded statement about Davenport. Because Snow was a victim, police did not charge her with prostitution loitering.

The State charged Davenport with two counts of first degree promoting prostitution, one count of first degree unlawful possession of a firearm, one count of possession with intent to manufacture or deliver methamphetamine, and one count of second degree assault – domestic violence. The jury found Davenport guilty as charged. Davenport appeals.

## DISCUSSION

Davenport makes five arguments. First, he argues that, in testifying, a police officer gave an improper opinion on guilt, violating Davenport's right to a jury trial. Second, he argues that the evidence was insufficient to prove count 4,

3

promoting prostitution. Third, he argues that the trial court erred in failing to order a competency evaluation for him. Fourth, he argues that the jury instructions failed to preserve jury unanimity and permitted a double jeopardy violation. Fifth, he argues that his dual convictions for assault and promoting prostitution violate double jeopardy.

## I. Opinion Testimony

Davenport argues that Detective Michael Garske gave an improper opinion by testifying that the idea of consensual prostitution is "'unicorn land.'" At trial, Davenport objected to Garske's comment on the grounds that it was improper opinion testimony. The court overruled his objection and allowed the testimony. Davenport argues that Garske's opinion was improper, because (1) it was a conclusive opinion on the only disputed element of the promoting prostitution charge and (2) it was beyond his actual expertise.

Before opinion testimony is offered, the trial court must determine admissibility of the testimony. State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). In making this determination the court will consider the circumstances of the case, including the following factors: (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact. Id. at 199-200. Opinion testimony is not objectionable merely because it embraces an ultimate issue that the jury must decide. Id. at 197; ER 704. Some areas, however, are clearly inappropriate for opinion testimony in criminal trials, including personal opinions, particularly expressions of personal belief, as to the defendant's guilt, the intent of

the accused, or the veracity of witnesses. Quaale, 182 Wn.2d at 200. Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury. Id. at 199.

We review decisions to admit evidence for an abuse of discretion. Id. at 196. The trial court has abused its discretion on an evidentiary ruling if it is contrary to law. Id. at 196-97. An abuse of discretion exists when a trial court's exercise of its discretion is manifestly unreasonable or based on untenable grounds or reasons. Id. at 197.

A. Conclusive Opinion

Davenport likens this case to State v. Montgomery, 163 Wn.2d 577, 183 P.3d 267 (2008). In Montgomery, the court held that the State's witnesses gave improper opinions when they testified about the defendants' intent in purchasing items used to manufacture methamphetamine. 163 Wn.2d at 594, 587-88. A detective testified, "'I felt very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased.'" Id. at 587-88. And a chemist, after surveying the purchases of the defendants, testified, "'[T]hese are all what lead me toward this pseudoephedrine is possessed with intent.'" Id. at 588.

Davenport argues that, like the opinion testimony in Montgomery, Garske's testimony that the idea of consensual prostitution is "'unicorn land'" foreclosed the jury's decision on whether Davenport compelled Snow and Jasmin to engage in

5

prostitution. But, there are key differences. In <u>Montgomery</u>, the witnesses gave opinions about the intent, and therefore the guilt, of the specific defendants in the case. <u>Id.</u> at 587-88. While here, Garske did not comment on Davenport's actions or give opinions about the parties in the case. In fact, he explicitly said that he did not review the police reports or transcripts of interviews associated with Davenport's investigation. And, Garske's testimony that the idea of consensual prostitution is "'unicorn land'" was a broad viewpoint on the nature of prostitution.

During his testimony, the State asked Garske, "How long did it take you to get comfortable with the subject matter and a working knowledge of like how the pimping and prostitution works?" Garske answered,

> I think on a surface level where we see it on [television] or read about it our [sic] a YouTube video, that stuff is – it's right out there in the public; we all understand that. It's what happens behind the scenes. It's the exploitation. It's the violence. It's just the nature in where these girls are living on a day-to-day basis where at any given time, they're [sic] life is in peril; if not, it's a very abusive environment that they live it [sic], and, if not that, it's just very dangerous. There isn't anything safe about the stuff behind the curtain when it comes to prostitution. The argument of it's consensual sex between two adults, that's unicorn land.

Davenport objected, on the basis of "improper opinion testimony." The trial court overruled the objection. The State continued:

> Q . . . Can you describe what you mean by, "it's unicorn land"?
>
> A That's just want [sic] people just want to believe that it is; when, in all actuality, it's not. The exploitation part of it is always there. The girls do not get up out of bed and say, "I want to be a prostitute today." The girls do not want to put themselves in the situation that they've probably already been in before, which is they've been assaulted, robbed, or raped, whether that be by a client or by a pimp; they don't make that conscious decision without some sort of exploitation.

6

Garske commented that women do not engage in prostitution "without some sort of exploitation." This is not the same as testifying that the women associated with this case were <u>compelled</u> by Davenport to engage in prostitution through the use of force or threats, the disputed element of Davenport's promoting prostitution charge. And, Garske testified that he does not agree with what he feels is a general perception about prostitution, that it is "consensual sex between two adults." Stating that prostitution is not consensual sex is not the same as stating that all prostitutes are compelled by pimps to engage in prostitution.

B. <u>Witness Expertise</u>

Davenport also argues that Garske's opinion was improper because it conveyed an aura of certainty beyond his expertise.

Under ER 702, the court may permit "'a witness qualified as an expert'" to provide an opinion regarding "'scientific, technical, or other specialized knowledge'" if such testimony "'will assist the trier of fact.'" <u>State v. Yates</u>, 161 Wn.2d 714, 762, 168 P.3d 359 (2007). Practical experience is sufficient to qualify a witness as an expert. <u>Id.</u> at 765. In <u>Yates</u>, the defendant argued that the trial court erred in permitting Lynn Everson to testify as an expert on prostitution. <u>Id.</u> at 764. Everson worked for the Spokane Regional Health District and had 13 years of experience providing outreach services to prostitutes. <u>Id.</u> The court found that her practical experience qualified her as an expert. <u>Id.</u> at 765.

Likewise in <u>State v. Simon</u>, this court found that a detective involved in investigating street prostitution for over 6 years, and who had investigated over 400 prostitution related crimes, was qualified to testify as an expert. 64 Wn. App.

7

948, 963-64, 831 P.2d 139 (1991), rev'd in part on other grounds, 120 Wn.2d 196, 840 P.2d 172 (1992). In Simon, the detective testified, "I would have to say that my experience indicates that there are in fact two separate and distinct relationships based essentially on the same premises. And that is the pimp's psychological manipulation of the prostitute." Id. at 953.

The detective elaborated on two types of pimps, stating,

"Most prostitutes will encounter a "Soft Mack" before a "Hard Mack." The "Soft Mack" will be what's referred to as a boyfriend pimp. It will be somebody who butters her and tells her that she's real good looking, and we can have our way with the world, babe. Just go out and get us some money. He's the pimp that will convince her that he is in love with her, and this is their avenue to progress in the world. And then there's the "Hard Mack." And generally, when a gal encounters a "Hard Mack," some[one] who is very forceful and psychologically dominating, they are already in the state of mind where they are amenable to that person's suggestions or threats, even if the threats aren't overt; they are in a frame of mind where they are amenable."

Id. (alteration in original).

The examination of the detective continued,

"Q: What sort of personalities do most of the prostitutes have that you have come in contact with?

"A: Most of the prostitutes that I have come in contact with have had very little or no self-esteem. They think very poorly of themselves. They are essentially, in their own minds, they are worthless.

". . . .

"Q: Do most of the prostitutes that you had contact with enjoy being prostitutes?

"A: No, they don't.

"Q: Why do they continue doing it?

"A: They have no option.

"Q: In their mind they have no option?

"A: Correct.

"Q: In terms of the financial relationship between a pimp and a prostitute, what would be a typical financial relationship?

"A: The financial — The standard financial relationship is that the prostitute gives the pimp every penny that she earns. . . .

" . . . .

"Q: How is it that a pimp manages to keep control of or have access to prostitutes?

" . . . .

"A: Okay. The prostitutes come from the ranks of the runaways. Essentially, by keeping in contact with the people that are on the street looking for something, looking for shelter, looking for something to eat, they will continually be in contact with new faces.

" . . . .

"Q: Well, if a prostitute wants to switch and work for somebody else, are they typically deemed to be free agents, and they can moved around at will?

"A: No, they are not.

"Q: What impediments are there to doing that?

"A: Well, a pimp doesn't want to give up a girl. I mean, for obvious reasons, he gets an income from the girl, and the girl has value to him in that she is a steady source of income. And if she decides that she wants to be with a different pimp, it is the burden of that pimp to go to her former pimp and notify him that she won't be bringing you money anymore, she's now bringing her money to me."

Id. at 953-55 (some alterations in original).

This court held that the trial court did not abuse its discretion in admitting the detective's testimony, reasoning,

> Detective Benson's testimony regarding the pimp/prostitute relationship was helpful to the jury because the average juror would not likely know of the mores of the pimp/prostitute world. . . . [T]he testimony did not constitute an opinion as to Simon's guilt. Detective Benson did not testify that Simon did or did not threaten Bartall; rather, Detective Benson testified in general terms about the nature of the pimp/prostitute relationship.

Id. at 964.

Here, Davenport argues that, because Garske testified in "absolute terms about the issue of compulsion," his testimony went beyond what the courts found admissible in Yates and Simon. He also contends that Garske's testimony invaded the province of the jury because he discredited Snow's testimony and assured them that it was "categorically impossible" that she was telling the truth.

Garske testified that, in his 29 years of law enforcement, he has been involved in over 1,000 investigations involving "pimping and promoting prostitution." Garske described his experience interacting with prostitutes, both as a patrol officer and as a detective. Based on his practical experience, Garske was qualified to testify as an expert on the relationship between prostitutes and pimps. Garske explained what he meant by "unicorn land," stating, "The girls do not want to put themselves in the situation that they've probably already been in before, which is they've been assaulted, robbed, or raped, whether that be by a client or by a pimp; they don't make that conscious decision without some sort of exploitation." Garske testified generally about the violence and exploitation prostitutes face, in his experience. His testimony did not go beyond the expertise gained from his practical experience. And, Garske did not impermissibly discredit

Snow's testimony because he testified before her, and did not have any knowledge of what she was going to tell the jury.

The court did not abuse its discretion in allowing the testimony.

II.    Sufficiency of Evidence

Davenport asserts that there was insufficient evidence to convict him of one of the counts of promoting prostitution.    He argues that reversal is required, because the State failed to prove that he compelled Snow to engage in prostitution.

The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.  Id.  The elements of a crime may be established by either direct or circumstantial evidence, and one type of evidence is no more valuable than the other.  State v. Wilson, 141 Wn. App. 597, 608, 171 P.3d 501 (2007).  This court defers to the jury on credibility determinations, assessing discrepancies in the trial testimony, and weighing the evidence.  See id.

A person commits first degree promoting prostitution when he or she knowingly advances prostitution by compelling a person by threat or force to engage in prostitution, or profits from prostitution which results from such threat or force.  RCW 9A.88.070(1)(a).

Davenport argues that the evidence fails to show that he compelled Snow to engage in prostitution.  He contends that (1) she testified that she acted of her

11

own free will, (2) the fact that there was abuse does not prove the element of compulsion, and (3) an officer's opinion testimony that there is no prostitution that is not coerced does not establish compulsion here.

Davenport first points to Snow's testimony as evidence that Davenport did not compel her to engage in prostitution. On cross-examination counsel asked, "Do you feel like Mr. Davenport used violence to make you prostitute yourself?" Snow answered,

> No, that has never -- no, I don't think that he forced that. I'll stand by that. He's never force[d] me to hoe [sic], or be a prostitute, or just sell sex for anything ever; that was always my hustle, what I did to make my way. I just left him in charge of the money.

But, evidence is not insufficient merely because there is testimony that conflicts with other evidence. See Wilson, 141 Wn. App. at 608 (appellate court defers to trier of fact on issues of conflicting testimony and the persuasiveness of the evidence).

Davenport argues that although the jury might disbelieve Snow's testimony that she voluntarily engaged in prostitution, this does not establish that Davenport compelled her to do so. That is true, but Snow also testified about numerous times Davenport abused her. She testified that the first time he beat her was on the third day after they met, stating,

> I was sick, I didn't feel good, and it wasn't because of drugs or anything else about it; I just had a cold or something being out in rain, and he was trying to buy me soup and stuff. And sometimes I'm not like, you know, I don't know. I'm now making excuses.
>
> I don't know. We were in the bathroom, and I just remember my head flying into the mirror, and after a while him holding the gun to my head. I just told him to pull the trigger because I'm not afraid

to die, just pull it; and then I remember him just walking out, and I picked myself up and put myself back together.

Snow testified that Davenport hit her from behind, grabbing her neck, and her head hitting the mirror. And, later in the first week they met, Snow testified, "[O]ne of my exes had figured out I was still in Washington, the guy I started there with, and I was out-of-pocket texting the guy back, and that's the day he beat the ever-loving shit out of me." Snow also explained that by "out-of-pocket" she meant, "Out of line. I was texting another man, which is disrespectful because it shows that I didn't have respect for my daddy, or pimp, or source."

Additionally, Snow testified, "I used to get beat up every 30 days, if not more." She testified that Davenport beat her for "[e]verything; if he felt I was breathing wrong. I was getting embarrassed, abused, and left out." Even after Snow felt like it was "over" with Davenport they were still in contact every day, and after Davenport went to jail she continued to give him the money she made from prostitution. Snow described a time when Davenport told her to assault Jasmin. Davenport told Snow, "'Beat her ass or I'm going to beat your ass.'" Although Snow initially complied, after Davenport began assaulting Jasmin, Snow tried to guard Jasmin with her body. Snow testified that she "took a lot of the kicks; a couple of the punches in the head because I know where he aims."

Davenport argues that this case is different from Simon. In Simon, this court held that there was sufficient evidence to support the conviction of promoting prostitution. 64 Wn. App. at 960. There, a witness who engaged in prostitution "testified that when she suggested leaving, some degree of physical force was applied by [the defendant]." Id. The court stated that from her testimony, along

13

with testimony from an officer about the "'unwritten rules'" that govern the relationship between pimps and prostitutes, the jury could find the defendant guilty of promoting prostitution by use of threats or force. Id.

Davenport argues that unlike in Simon, here there was no link between Davenport's violence and Snow's decision to engage in prostitution. But, Snow testified extensively about the abuse in her relationship with Davenport. She testified about her "codependency" and how she "wanted to be a good woman and stand up for my man." She testified that she gave all the money she made to Davenport. Although Snow never explicitly stated that Davenport used threats or violence to control her, she testified about leaving Davenport, "I had just got home -- like I had just run away, and he just brought me back." The jury could infer from that testimony that Davenport used threats or force to do so.

This court has recognized that victims of domestic violence often attempt to placate their abusers in an effort to avoid repeated violence, and often minimize the degree of violence when discussing it with others. State v. Grant, 83 Wn. App. 98, 107, 920 P.2d 609 (1996). As this court held in Grant, the jury is entitled to evaluate a witness's credibility with full knowledge of the dynamics of a relationship marked by domestic violence and the effect such a relationship has on the victim. Id. at 108. The evidence included Snow's extensive testimony about Davenport's abuse and the injuries he gave her, and the nature of their relationship. Even excluding Garske's testimony about the relationship between pimps and prostitutes, viewing the evidence in a light most favorable to the State, any rational

trier of fact could have found beyond a reasonable doubt that Davenport compelled Snow to engage in prostitution.

III.    Competency Evaluation

Davenport argues next that the trial court erred in failing to order a competency evaluation after his counsel raised doubts as to his competency.

The due process clause of the United States Constitution's Fourteenth Amendment prohibits the conviction of a person who is not competent to stand trial. In re Pers. Restraint of Fleming, 142 Wn.2d 853, 861, 16 P.3d 610 (2001). And, under Washington law, an incompetent person may not be tried, convicted, or sentenced for committing an offense so long as the incapacity continues. Id. at 862; RCW 10.77.050. "Incompetency" means a person lacks the capacity to understand the nature of the proceedings against him or to assist in his own defense as a result of mental disease or defect. RCW 10.77.010(15). Once there is a reason to doubt a defendant's competency, the court must follow the competency statute to determine his or her competency to stand trial. Fleming, 142 Wn.2d at 863. Failure to observe procedures adequate to protect an accused's right not to be tried while incompetent to stand trial is a denial of due process. Id.

The determination of whether a competency examination should be ordered rests generally within the discretion of the trial court. Id. The court must make the threshold determination that there is a reason to doubt competency before a hearing to determine competency is required. Seattle v. Gordon, 39 Wn. App. 437, 441, 693 P.2d 741 (1985). To determine whether to order a competency

15

evaluation, a trial court may consider the defendant's appearance, demeanor, conduct, personal and family history, past behavior, mental and psychiatric reports, and statements from defense counsel. Fleming, 142 Wn.2d at 863. There must be a factual basis to support a motion to determine competency. Gordon, 39 Wn. App. at 441-42. In exercising its discretion in determining the threshold question, the court should give considerable weight to the attorney's opinion regarding a client's competency and ability to assist in the defense. Id. at 442.

Davenport argues that defense counsel sufficiently raised doubts as to his competency, requiring the court to order a competency evaluation. Midway through the State's case, Davenport's counsel told the court that he had "concerns about Mr. Davenport's ability to effectively assist Counsel; and I'm not certain what the issue is, but I have a belief that it may be tied to Mr. Davenport's administrative segregation status."

Defense counsel continued,

> Mr. Davenport has some very important decisions that he has to make with regard to putting on a defense, and Mr. Davenport appeared to be unable to engage with Counsel about those decisions because he was so focused on his administrative segregation status, that [sic] fact that he is isolated. All he could really talk about was how that has been impacting him. . . .
>
> Obviously, I'm not a mental health professional. I have not raised competency in this case previously. I will represent to the Court that during the time that Mr. Davenport has been in trial in the courtroom, he's been able to answer questions for me, we've been able to communicate; however, this issue appears to be coming [sic] so pressing for Mr. Davenport that I'm starting to have concerns about Mr. Davenport's ability to assist Counsel and make decisions that he is going to need to make very soon with regard to the defense that we're about put [sic] on.

16

When the court inquired whether Davenport was "unable" or "unwilling" to communicate with counsel, defense counsel responded, "I won't be able to make a better record of that . . . because I am not a mental health professional." Counsel further stated, "Competency has never been an issue relative to my representation of Mr. Davenport, and I don't know that he has a history of mental health illness, and we've never had a concern about competency; but [that's] what I witnessed yesterday evening, and Mr. Davenport's perseveration on his administrative segregation status."

The trial court stated,

> I candidly have observed him in any number of circumstances in front of the jury, as well as with Counsel and in his colloquy with the Court.

> . . . .

> Competency is not the question, the difference between right and wrong is not the question; the ability to work with Counsel in terms of ability to speak English, listen, take notes, offer information to Counsel in court suggests strongly that there is not a competency problem, in my view; but I haven't seen anything, and the declaration or attestation you're making now is insufficient, as far as I am concerned.

Our Supreme Court has recognized that "a defendant must be 'capable of rationally assisting his legal counsel in the defense of his cause.'" State v. Harris, 114 Wn.2d 419, 428, 789 P.2d 60 (1990) (quoting State v. Wicklund, 96 Wn.2d 798, 800, 638 P.2d 1241 (1982). But, the ability to assist is a "minimal requirement." Id. at 429. A defendant who is angry and not fully cooperative with his counsel is not incompetent to stand trial. See State v. Hicks, 41 Wn. App. 303, 309, 704 P.2d 1206 (1985) (holding that the trial court did not abuse its discretion

17

in denying the competency hearing request, based on the record and a colloquy with Hicks, even though defense counsel stated that it was "absolutely impossible to with work with" Hicks.).

Here, when counsel raised the competency concern, the trial court properly considered its observations of Davenport's past behavior, as well as statements from defense counsel. See Fleming, 142 Wn.2d at 863. Counsel stated that he had not had any competency concerns prior to his visit with Davenport the previous evening. The trial court remarked that it had seen Davenport communicate effectively with his counsel "in any number of circumstances." Davenport's counsel did not provide an adequate factual basis to support a competency evaluation. The trial court did not abuse its discretion in declining to order a competency evaluation.

IV. Jury Instructions

Davenport contends next that the jury instructions failed to preserve jury unanimity and permitted a double jeopardy violation.

The instructions to convict Davenport of the promoting prostitution charges, counts one and four, were identical except count one named Jasmin while count four named Snow, and they mentioned slightly different time periods. The instruction for count one stated in part,

> To convict the defendant of the crime of promoting prostitution in the first degree, as charged in Count I, each of the following elements of the crime must be proved beyond reasonable doubt:
>
> (1) That during the time intervening between February 1, 2016 and June 1, 2016, the defendant

18

(a) knowingly advanced prostitution by compelling Jasmin McLain by threat or force to engage in prostitution, or

(b) knowingly profited from prostitution that was compelled by threat or force; and

(2) That any of these acts occurred in the State of Washington.

If you find from the evidence that element (2) and either of alternative elements (1) (a) or (1) (b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to count I. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (1) (a) or (1) (b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.[2]

Davenport argues that the instruction failed to preserve jury unanimity because there is not a named person in option (1)(b). And, he contends that if the jury chose to convict on the alternative means of profiting from compelled prostitution, it could have relied on the same acts for both counts one and four, violating double jeopardy.

Double jeopardy is violated when a person is convicted multiple times for the same offense. State v. Barbee, 187 Wn.2d 375, 382, 386 P.3d 729 (2017). A double jeopardy claim such as this one may be addressed for the first time on appeal. State v. Mutch, 171 Wn.2d 646, 661, 254 P.3d 803 (2011). This court reviews double jeopardy claims de novo. Id. at 661-62.

Even jury instructions that permit a jury to convict a defendant of multiple counts based on a single act do not necessarily mean that the defendant received multiple punishments for the same offense. Id. at 663. In reviewing allegations of

_____

[2] The to convict instruction for count four was nearly identical, but gave a time period between January 15, 2016 and June 1, 2016 and named Snow in (1)(a).

19

double jeopardy, an appellate court may review the entire record to establish what was before the court. Id. at 664. There is no double jeopardy violation when the information, instructions, testimony, and argument clearly demonstrate that the State was not seeking to impose multiple punishments for the same offense. Id.

In Mutch, the "to convict" instructions for each rape count were nearly identical, and they all indicated the same time of occurrence of the criminal conduct. Id. at 662. There was no instruction that each count must be based on a separate and distinct criminal act. Id. The court held that although the jury instructions were deficient, it was manifestly apparently from the record that the jury found the defendant guilty of five separate acts of rape. Id. at 665.

Davenport argues this case is distinguishable from Mutch, because it is not manifestly apparent from the record that the jury did not rely on the same act for both counts of promoting prostitution. Mutch is distinguishable, but not for the reason Davenport claims. While in Mutch the instructions themselves were not sufficiently distinctive, here the to convict instructions for counts one and four clearly indicated separate people, Snow and McLain. The instructions also had slightly different time periods. Further, the State presented evidence in Snow's testimony that Davenport compelled and profited from Snow's prostitution before he brought in McLain. And, in closing the State made it clear that it charged Davenport in "Count [one] with promoting prostitution in the first degree and as it pertains to Jasmin McLain" and in "[c]ount [four], promoting prostitution in the first degree with respect to Kayla Snow." The State went on to discuss the evidence for each count separately.

Citing State v. Kier, 164 Wn.2d 798, 813, 194 P.3d 212 (2008), Davenport argues that the State does not avoid a double jeopardy problem by discussing the counts separately in its closing argument. But, in Kier, the court distinguished that case, where the State relied only on the prosecutor's closing argument, from a previous case in which "the evidence, jury instructions, and closing argument all supported the election of a specific criminal act." 164 Wn.2d at 813. Here, the jury instructions, the State's evidence specific to each count, and the closing argument all made it clear that the State was not seeking multiple offenses for the same criminal act.

The jury instructions were not erroneous.

## V.    Double Jeopardy

Finally, Davenport argues that his dual convictions for assault and first degree promoting prostitution violate double jeopardy.

Double jeopardy claims may be raised for the first time on appeal and are reviewed de novo. Mutch, 171 Wn.2d at 661. When a single act violates multiple criminal statutes, double jeopardy prevents multiple punishments if the legislature did not intend the crimes to be treated as separate offenses. See State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). The merger doctrine is one tool for determining legislative intent. State v. Wade, 133 Wn. App. 855, 871, 138 P.3d 168 (2006). Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime. State v. Freeman, 153 Wn.2d 765, 772-73, 108 P.3d 753 (2005).

21

Davenport argues that the act of force used to elevate his promoting prostitution charge to first degree was the same act of force that constituted the second degree assault. He correctly identifies one of the differences between first and second degree promoting prostitution—first degree requires proof that the prostitution was compelled by threat or force, while second degree does not.[3] RCW 9A.88.070(1); RCW 9A.88.080(1). Davenport contends that the jury might have relied on the same incident, in which he assaulted Snow, to convict him of second degree assault and as the act to elevate count four to first degree promoting prostitution.

Davenport's argument fails. To convict on second degree assault, the jury had to find that "on or about April 15, 2016, the defendant intentionally assaulted Kayla Snow and thereby recklessly inflicted substantial bodily harm." That was the incident in which Snow testified that she had to get stitches after Davenport hit her in the mouth with his gun for being jealous of Jasmin. The second degree assault of Snow was not necessary to prove first degree promoting prostitution of Snow and was not offered to do so. The State identified the basis for the second degree assault charge to the jury in its closing statement as the time when Davenport hit Snow because she expressed her jealousy of Jasmin, and referenced her hospital visit to establish the date. By contrast, the State presented the promoting

---

[3] A person is also guilty of first degree promoting prostitution if he or she knowingly advances prostitution "[b]y compelling a person with a mental incapacity or developmental disability that renders the person incapable of consent to engage in prostitution or profits from prostitution that results from such compulsion." RCW 9A.88.070(1)(b). This is another difference between first and second degree promoting prostitution.

22

prostitution charge as a continuing course of conduct with evidence of a range of force and threats throughout the charging period. See State v. Gooden, 51 Wn. App. 615, 618, 754 P.2d 1000 (1988) (promoting prostitution may be charged either as continuing course of conduct or based on a single incident, and jury unanimity as to a single specific act is not required). Davenport was not punished twice for the same offense. Davenport's convictions did not violate his right against double jeopardy.

We affirm.

_Appelwick, C.J._

WE CONCUR:

_Andrus, J._          _Schindler, J._