

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  35665-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAMMIE ANN ELLIOTT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Tammie Elliott appeals second degree theft and money laundering convictions imposed for her involvement as an intermediary in an advance-fee scam[1] in which she cashed the victim's money orders and forwarded funds to the scam's architect.  She argues she was denied a fair trial when the State invited law enforcement officers to share their belief that she acted not unwittingly, but with criminal intent.

The officers' testimony was unquestionably improper opinion testimony as to Ms. Elliott's criminal intent and inferentially, her guilt.  Because untainted evidence proved

---

[1] Such scams are often referred to as "Nigerian" scams, but since they originate in other countries (including the United States), we adopt the neutral term "advance-fee scam."  See *Advance-Fee Scam*, WIKIPEDIA, https://en.wikipedia.org/wiki/Advance -fee_scam [https://perma.cc/R4ND-YQYX].

her knowing participation beyond a reasonable doubt, however, the error was harmless. We affirm.

FACTS AND PROCEDURAL BACKGROUND

In early 2016, Warlenda McClair of Toledo, Ohio, began receiving electronic mail from "Herbert Smith," ostensibly a solicitor in London, who informed her that his late client, Schwarz Neumann, had named her a beneficiary in his will, leaving her $6.3 million. "Mr. Smith" informed Ms. McClair that Mr. Neumann "may have contacted you in the past or simply you were referred to him by one of his numerous friends abroad who wished you good." Ex. P-1. She later received electronic mail from "Lain MacKay," ostensibly a finance director for HSBC Bank Plc, concerning the process for making the bequest available. Based on steps she was told were necessary to secure release of the funds, Ms. McClair sent three MoneyGrams to Tammie Elliott of Lewiston, Idaho, between February 1 and April 1, 2016, for pick up at the Clarkston, Washington, Walmart. They were in the amounts of $350, $300, and $630, respectively. When Ms. McClair and her husband Joseph McClair later realized they were the victims of a scam, Mr. McClair contacted Lewiston police who referred the matter to Clarkston police for investigation.

Sergeant Bryon Denny determined that Tammie Elliott was a real person and a resident of Lewiston, and also learned that she had been questioned in the past about her role as an intermediary in advance-fee scams. She had never been charged because her

participation had previously been perceived as unwitting. Upon traveling to her home to speak to her about the McClairs' payments, Sgt. Denny informed Ms. Elliott that this time he was reporting it to the prosecutor's office.

Ms. Elliott was charged with one count of second degree theft and one count of money laundering. She notified the State she would assert two defenses: a general denial and duress. She gave notice of three witnesses she might call, all of whom were identified as being familiar with her reputation in the community as honest but extremely "manipulable and impressionable." Clerk's Papers (CP) at 94-95. Two of the witnesses were also identified as being aware that Ms. Elliott was fearful of Collins King, a resident of Africa for whom she had picked up and cashed money orders and transmitted cash in the past.

Among the State's witnesses at the time of trial were Sgt. Denny and three other law enforcement officers who had fielded reports in 2010, 2011, and 2012, of fraud or possible fraud, in which money had been paid to Ms. Elliott, who then transmitted it (or almost all of it) to individuals in Africa.

The earliest fraud, reported in June 2010, was investigated by Sgt. Rick Fuentes of the Lewiston Police Department. Sgt. Fuentes testified that the fraud had involved an advertisement for a rental home in California that listed Ms. Elliott as the person to whom a rental deposit should be paid. Sgt. Fuentes told jurors he spoke to Ms. Elliott in 2010 and informed her that the people sending her money were not receiving keys or being

3

given access to the property offered for rent. According to the sergeant, Ms. Elliott told him she sent the money she received to her fiancé, David Atkins, who lived in Nigeria. Sgt. Fuentes told jurors she appeared surprised when he told her she was involved in a scam, and that he was "very clear with her that this was definitely a scam and that she should no longer be involved in any type of money order transactions." Report of Proceedings (RP) at 41.

The prosecutor then questioned Sgt. Fuentes about his assessment of Ms. Elliott's understanding that she was participating in fraudulent activity. Here, and hereafter, we italicize questions and answers that Ms. Elliott argues presented improper opinion testimony:

> Q      Ultimately—did you ask that this be sent up for charges?
>
> A      Based on my conversation with her and this investigation I did not at the time.
>
> Q      Why not?
>
> A      I felt at the time possibly she was a victim of this Nigerian scam, based on the information that I had at the time, thinking she was getting taken advantage of.
>
> Q      You say based on the information you had at the time.
>
> A      That's correct.
>
> Q      *Has your position on her involvement changed since 2010*[*?*]
>
> A      *Absolutely.*
>
> [DEFENSE COUNSEL]: Objection. Calls for—I'm sorry. Lack of foundation, opinion testimony.

[NO RULING IS REPORTED]

Q      Officer, have you been provided with information about Ms. Elliott's involvement in other similar scams[?]

A      Yes, I have.

Q      *Based on that information and based on your contact with her back in 2010, that opinion that you expressed that she was an unwitting participant, has that opinion changed?*

A      *Absolutely. I believe—there's no doubt—Based on my investigation and the information that was brought to me that she is a willing participant in scamming people out of money and sending it to whoever.*

      [PROSECUTOR]:  Thank you.  No further questions.

RP at 43 (emphasis added based on Br. of Appellant at 12-13).  On redirect, the

prosecutor touched on the sergeant's opinion again:

Q      [Defense counsel] asked you about—in your experience and that sometimes innocent folks get swept up into the scam.  *Is Ms. Elliott one of those?*

A      *I don't believe so.*

Q      You said something in response to [counsel]'s question about maybe initially they might now know, but when it goes on for a while you had a different opinion about whether or not people know they're being—they're participating in a criminal scam.

A      That's correct.

Q      *. . . frequency—*

A      *Oh. Yeah. Maybe an initial contact, maybe one or two money orders, but when it includes numerous money orders and over a seven-year period that I am aware of—This obviously could have been taking place—much before—there's no doubt that she knew exactly what was taking place in this incident.*

RP at 47-48 (emphasis added based on Br. of Appellant at 13).

5

The second fraud was investigated in December 2011 by Detective Jackie Nichols of the Asotin County Sheriff's Office. In that case, an out-of-state victim who advertised his availability to do computer work was hired to do $400 worth of work, but received a check from his client for $2,400, with a request that he wire the extra $2,000 to Tammie Elliott in Clarkston. He did, after which the check he had received bounced, resulting in a loss to him of $2,400 in cash and services.

When questioned about her receipt of the $2,000, Ms. Elliott told the detective she was doing a favor for Mr. King, whom she had met online. Detective Nichols testified that she told Ms. Elliott that Mr. King "wasn't her friend and that he was actually using her as an accomplice to commit a crime. And she seemed like she wasn't aware of that." RP at 90. No charges were pressed, but Detective Nichols testified that she told Ms. Elliott she would be subject to prosecution if she "did it again." RP at 91. The detective testified that she also sent a follow-up letter to Ms. Elliott, dated December 27, 2011, that thanked her for her cooperation and stated:

> It appears you were being used as an unwitting accomplice in these crimes and this letter is to confirm that you will no longer take part in these illegal transactions.
>
> Any information you are able to find regarding the people involved and their contact information would be helpful to try to prevent other people from becoming victims or unwitting accomplices in the future.

Ex. P-9.

6

After a copy of Detective Nichols's letter was admitted and shown to jurors, the prosecutor asked the detective if she formed a belief in December 2011 as to whether Ms. Elliott was aware of the criminal nature of her conduct. The defense objected to opinion testimony. The court's ruling is reported as inaudible, but it apparently sustained the objection since the prosecutor moved on. In redirect, the prosecutor touched on the detective's opinion again—and although an objection was again sustained, Ms. Elliott points to the questioning as further evidence of the pattern:

> Q      You just told [defense counsel] that you didn't know whether—or that you had reason to doubt whether she knew it was a crime in 2011. Is that true?
>
> A      Right.
>
> Q      *Do you still harbor that doubt.*
>
> A      *No.*
>
> [DEFENSE COUNSEL]: I'm going to object to—to the characterization of the testimony and the questioning. I don't think the issue of her opinion ever came up in my cross examination.
>
> [PROSECUTOR]: She did testify that she doubted, or had reason to doubt back in 2011.
>
> THE COURT: —was not sure whether or not she knew it was a crime is what she (inaudible).
>
> THE WITNESS: Right.
>
> Q      What—what is your sense of her knowledge at this time.
>
> [DEFENSE COUNSEL]: I'm going to renew my objection on the province of the jury—
>
> [PROSECUTOR]: I'll withdraw the question—
>
> THE COURT: —sustain the objection.

RP at 96 (emphasis added based on Br. of Appellant at 15).

7

The third report of possible fraud was by Ms. Elliott herself, who contacted the Clarkston Police Department in March 2012 and then came to the department to speak with then-Officer Michael Babino.  (By the time of trial, Michael Babino had become employed by the Asotin County Sheriff's Office as a deputy sheriff.)  According to Deputy Babino, she told him that someone had wired her money from Cedar Falls, Iowa, and she had then forwarded the money to Mr. King, in Lagos, Nigeria.  Deputy Babino testified that when he told her she was most likely involved in some sort of a scam, "She seemed to have something of an epiphany . . . [like] a light came on, maybe it had just occurred to her during the conversation that she may be involved in some sort of fraudulent or illegal activity."  RP at 24.  The deputy testified that he cautioned Ms. Elliott against sending money abroad and that "if it was a scam she could very well be complicit and could have criminal charges filed against her."  RP at 25.

In testimony that followed and that was peppered with objections, Deputy Babino testified that on the same day Ms. Elliott came into speak with him, another Clarkston police officer received information from Cedar Falls, Iowa, "in reference to a scam that [Ms. Elliott] was involved in."  RP at 26.  The prosecutor then elicited the following testimony:

> Q      Based on the information you were provided about the other Cedar
>        Falls, Iowa scam do you have an opinion as to why she contacted
>        law enforcement?
>        [DEFENSE COUNSEL]:  Objection.

A    I do.

THE COURT:  Hold up.

[DEFENSE COUNSEL]:  Calling for an opinion—It's calling for speculation, your Honor.

THE COURT (off mic'):  —calling for speculation as (inaudible).

Q    *After you found out the information about this other Cedar Falls scam did your assessment of Ms. Elliott's surprise change*[*?*]

A    *It didn't seem very genuine.*

[PROSECUTOR]  Thank you.  I have no further questions, then.

RP at 32-33 (emphasis added based on Br. of Appellant at 11).

When the prosecutor questioned Sgt. Denny about his investigation of the fraud

committed against the McClairs, he also touched on the sergeant's opinion:

Q    Then what did you do?

A    After finishing up talking to her I told her that this report would be submitted to the prosecutor's office, I told her this was a scam and— not take any more money from anyone.

Q    Did you—did you make mention about the fact that she had previously been contacted on a similar scam?

A    Yes.

Q    What did you tell her about that?

Q    Told her all these previous ones were scams.

A    *At that time did you have any doubt in your mind as to whether or not Ms. Elliott was an active participant in a criminal enterprise?*

[DEFENSE COUNSEL]:  Objection.  Calls for speculation.

[PROSECUTOR]:  No, it doesn't.  It's his state of mind.  I can ask it a different way.

THE COURT: Please do.

Q    Sgt. Denny, you referred this to prosecution for criminal charges?

9

A    That's correct.

Q    *In so doing did you fill out a sworn statement as to your belief—probable cause?*

A    *Yes.*

Q    *What was your statement of probable cause?  What did you believe—probable cause to support?*

A    *That she had committed the crime of theft.*

Q    *And—you had probable cause based on your investigation—*

A    *Correct.*

Q    *—that point?*

RP at 12-13 (emphasis added based on Br. of Appellant at 9-10).

Ms. Elliott testified in her own defense, disputing many details from Sgt. Fuentes's testimony and denying that Detective Nichols ever sent her a letter.  But she acknowledged her involvement in cashing money orders and sending money to Mr. King. She acknowledged that police talked to her in 2010 about what they said was a Nigerian scam and that it concerned her, but she testified that when she confronted Mr. King, "he told me that—that he would never do anything to put me in danger.  And I believed him." RP at 140.  She admitted having been talked to by Detective Nichols but said she could not recall whether the detective told her that what she was involved in was a scam, and illegal, and she could get in serious trouble for it.  She did not dispute Deputy Babino's testimony.

Ms. Elliott testified that by 2015, "probably the spring," she and Mr. King got into a big fight and she decided not to help him with cashing and forwarding funds anymore.

RP at 147.  She stopped responding to his e-mails and according to her, "he started getting kind of nasty with me" and "making threats to me."  RP at 145.  She and two friends called as defense witnesses attempted to testify to the content of repeated threats she allegedly received by text, but the State's objections on hearsay grounds were largely sustained.  What was made clear by their testimony was that she received numerous texts from Mr. King during the "hottest part of the summer of 2015" that included "terrible threats."  RP at 101, 166.

Asked by defense counsel if she sent any more money to Mr. King thereafter, Ms. Elliott testified, "There was one last time.  It was money that I had—that he had asked, and so I did, just—just to get—to shut him up."  RP at 155.

At the conclusion of the evidence, the trial court ruled that it would not instruct the jury on Ms. Elliott's proposed defense of duress, given the remoteness in time of the threats reportedly received during the summer of 2015 from her receipt and transmittal of the McClairs' funds in February, March, and April of 2016.

The jury found Ms. Elliott guilty as charged.  The trial court imposed a first time offender waiver and sentenced her to six months' supervision.  She appeals.

ANALYSIS

Ms. Elliott makes two related assignments of error.  Her first contention is that she was denied a fair trial when the State elicited the opinions of law enforcement officers that she was guilty.  Alternatively, and to the extent the error was not preserved by timely

11

and proper objections, she contends her trial lawyer provided ineffective assistance of counsel.

ER 701 permits testimony "in the form of opinions or inferences" that are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704.

Nonetheless, "there are some areas that are clearly inappropriate for opinion testimony in criminal trials." *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). "Among these are opinions, particularly expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses." *Id.* (citing *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)). Impermissible opinion testimony can be reversible error because it "violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). A trial court's ruling on the admissibility of opinion evidence is reviewed for abuse of discretion. *Demery*, 144 Wn.2d at 758.

Washington courts have held that "testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, [which] is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." *City of*

*Seattle v. Heatley*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993). The State takes this to mean that witnesses could state or imply their belief that Ms. Elliott was a knowing participant as long as they did not use the word "guilty." That is not what the cases hold. "Opinions on guilt are improper whether made directly *or by inference*." *State v. Quaale*, 182 Wn.2d 191, 199, 340 P.3d 213 (2014) (emphasis added) (citing *Montgomery*, 163 Wn.2d at 594).

What *Heatley* and similar cases establish is that the mere fact that an opinion on something other than guilt, supports a finding of guilt, is not enough to make the opinion improper. *State v. Collins*, 152 Wn. App. 429, 436, 216 P.3d 463 (2009) is illustrative. In that case, evidence of a taxi driver's murder included photographs from the taxi's surveillance system of his last passenger. The photographs were imperfect in several respects. The surveillance system

> produced still photographs at set intervals. The photos [were] black and white, blurry, and grainy. Lighting conditions in the cab were poor. The passenger wore a baseball cap that cast a shadow over his eyes in all the images, and cast a shadow over his entire face in some. He wore a bulky coat that concealed his build. He also held a cigarette in his mouth, a posture in which the jury presumably did not observe [him] during trial.

152 Wn. App. at 438. Given these circumstances, the trial court concluded that testimony from the defendant's family and friends who could identify him as the passenger in the photographs would be helpful to the jury. "Witnesses who have interacted with the defendant in a variety of circumstances, in a way the jury could not, may have a great

advantage over the jury's limited exposure to the defendant." *Id.* The testimony of

witnesses making the identification supported a finding of guilt. But the questions they

were asked, and the answers they gave, only identified the defendant as the person in the

photographs—they were not a comment on the defendant's intent or whether he was

guilty.

Here, the challenged law enforcement testimony expressed belief about Ms.

Elliott's criminal intent. Inferentially, the testimony conveyed the witnesses' belief in her

guilt. As the State itself admits,

> All of the officers who testified in this case based their opinions on their
> perceptions of the Appellant. The testimony regarding their assessment of
> the Appellant's "guilty knowledge" went directly to the central issue of the
> case.

Br. of Resp't at 11. Among the improper testimony was Sgt. Denny's testimony about

his affidavit of probable cause, which conveyed to jurors that he believed Ms. Elliott had

committed the charged crimes. The State's contention that probable cause is different

from guilt beyond a reasonable doubt is true, but irrelevant. *Montgomery*, *Demery* and

other Washington cases treat *any* statement of opinion about a criminal defendant's guilt

as impermissible opinion testimony.

The State defends Sgt. Denny's testimony by citing dicta from *State v. Sutherby*,

which states that "[i]n some instances, a witness who testifies to his belief that the

defendant is guilty is merely stating the obvious, such as when a police officer testifies

14

that he arrested the defendant because he had probable cause to believe he committed the offense." 138 Wn. App. 609, 617, 158 P.3d 91 (2007), *aff'd on other grounds*, 165 Wn.2d 870, 204 P.3d 916 (2009). That is true when the point of the testimony is that the officer made the arrest—not that the officer believed the defendant was guilty. As explained by the United States Supreme Court, we instruct jurors on the presumption of guilt precisely because we want to "caution[ ] the jury to *put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment*, and to reach their conclusion solely from the legal evidence adduced." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978) (emphasis added).[2]

An issue remains as to whether the error was preserved. In a couple of instances, Ms. Elliott's trial lawyer objected to "opinion testimony" or to the prosecutor's questions invading the "province of the jury"—objections adequate to preserve the error. RP at 92, 96. In other instances, as Ms. Elliott concedes, her trial lawyer either did not object or he objected to questions as calling for speculation or lacking foundation, failing to preserve the error. She nonetheless argues that all of the improper opinion evidence is reviewable

---

[2] At oral argument, the State suggested that the officers' expressions of their opinions were responsive to defense evidence or to pretrial disclosures about evidence the defense would present. The State's argument and briefing has not provided any record citation supporting that argument. Our own review of the record reveals nothing done by the defense that opened the door to the officers' opinions.

under RAP 2.5(a)(3) as manifest constitutional error. Alternatively, she argues that any unpreserved error is the result of ineffective assistance of her trial counsel, which itself supports reversal of her conviction.

We avoid both of Ms. Elliott's arguments—and both are colorable arguments—by exercising our discretion under RAP 2.5(a)(3) to review unpreserved error. We review the error because we find it harmless, even under the constitutional harmless error standard. That standard requires that we look only to the untainted evidence to decide if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)).

Ms. Elliott argues that the error cannot be harmless because the improper evidence went to the only disputed element of the charge: whether she was a knowing participant. The fact that improper evidence goes to the only issue in dispute will often require retrial. Here, however, while Ms. Elliott disputed that her participation was knowing, untainted evidence left no room for reasonable doubt.

Even if Mr. King had managed to placate Ms. Elliott's concerns in the past, her own testimony and that of her witnesses makes it clear that she was aware of Mr. King's nefarious character by early 2016. She admitted that she was "uncomfortable" with the transactions by the spring of 2015. RP at 144. Her own evidence offered in support of her failed defense of duress establishes that by the summer of 2015, Mr. King was making serious threats, was harassing her, and was demanding her continued

16

participation as his intermediary. There was no evidence that Mr. King did anything after tormenting her in the summer of 2015 that would justify her in a belief that their financial dealings were innocent. Her testimony was that the reason she acted as his financial intermediary "one last time" (and she actually acted as the financial intermediary three more times) was "to shut him up." RP at 155. Given the testimony of three law enforcement officers as to what they told Ms. Elliott between 2010 and 2012 (the admissibility of which is unchallenged) and Mr. King's abusive and threatening treatment of her in the summer of 2015, no reasonable juror could find that she was an unwitting participant.

The convictions are affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, J.

17