**FILED**
**NOVEMBER 7, 2019**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  36645-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JEFFREY PAUL GIBLIN, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — In the concluding act of a road rage incident, a BMW sedan
driven by Jeffrey Giblin, traveling in reverse, slammed into Abel Loredo and the parked
Tesla in front of which Abel[1] was standing.  Abel's leg was crushed and required
amputation.  The principal dispute in Mr. Giblin's trial for first degree assault was
whether he assaulted Abel with the intent to inflict great bodily harm.  Mr. Giblin
claimed that putting his car in reverse and striking Abel was an accident.

We find no error or abuse of discretion by the trial court in admitting a lay opinion
from one of the State's witnesses at the same time it excluded a lay opinion from a
witness offered by the defense.  For that reason, and because matters raised by Mr. Giblin

---

[1] Abel and his brother Brian Loredo were both present.  We generally refer to the
brothers by their first names for clarity, intending no disrespect.

in a pro se statement of additional grounds for review lack merit or require evidence

outside the record, we affirm.

FACTS AND PROCEDURAL BACKGROUND

On an afternoon in early September 2016, Brian Loredo, accompanied by his

brother Abel, was driving his Tesla on Canyon Road in the Puyallup area, destined for

north Tacoma. Also traveling on Canyon Road was the defendant, Jeffrey Giblin, driving

a BMW sedan, accompanied by his 15-year-old son. Both drivers entered the on-ramp to

State Route (SR) 512 at the same time.

Brian would later testify that since the cars were side by side, he sped up as part of

the merging process. Mr. Giblin claimed that the Tesla "zoomed forward[,] cutting us

off." Report of Proceedings (RP)[2] at 627. It is undisputed that Mr. Giblin responded by

honking; he would later characterize his honking as "let[ting] them know I was there.

Cautionary." *Id.*

Brian and the Giblins agree that middle fingers were raised, although Brian and

the Giblins disagree about who flipped off who, or did so first. The Loredos' and

Giblins' versions about what took place in the time it took for the cars to travel on

SR 512 to Interstate 5 (I-5), and then to I-5's 38th Street exit, diverge widely. While their

---

[2] "RP" citations are to the report of proceedings that begins with proceedings on
January 9, 2018, and includes portions of the trial relevant to the appeal.

competing versions of those events were relevant at trial, they are immaterial to the issues on appeal.

Brian slowed down to leave I-5 at the 38th Street exit and it is undisputed that as he did, Mr. Giblin pulled in front of him and both Mr. Giblin and Brian pulled over and stopped. Brian and Mr. Giblin stepped out of their cars and argued. There was a short physical altercation, after which Mr. Giblin got back into his BMW and Brian turned back toward his own car. As Brian returned to the Tesla, Abel stepped out to speak to him, and the two stood in front of the car, where Abel asked Brian if he was okay. Speaking of Mr. Giblin, Brian said something like, "Dude's tripping. . . . He's crazy," and suggested that they wait for Mr. Giblin to drive off. RP at 256.

According to Brian and Abel, as they waited for the Giblin's to leave, Mr. Giblin revved his engine and then suddenly sped in reverse toward the two men. Brian was able to jump sideways, out of the way, but Abel, who was standing near the center of the Tesla, could only leap up in an effort to avoid being hit. Unable to leap high enough, his leg was crushed between the BMW and the front bumper of the Tesla. No sooner had Mr. Giblin struck Abel and the Tesla than he put the BMW into forward gear and drove off.

A passing motorist, Kome Eteuati, saw the collision and Mr. Giblins immediate departure and decided to follow the BMW to "get some justice for the guy that . . . [got] hit." RP at 122. He honked his horn in an effort to get the BMW to stop. When that did

not work, he used his cell phone to take pictures and a short video of the fleeing BMW

and its license plate.  He returned to the scene of the collision, where Abel had used

Brian's belt as a tourniquet to stop the bleeding and 911 had been called.  Abel was taken

to the hospital where his leg was amputated below the knee.

Mr. Eteuati's video was relied on by the Washington State Patrol to publicize its

search for the BMW and its driver.  Four days after the accident, Mr. Giblin contacted

police.  He was charged with first degree assault and failure to remain at the scene of an

accident involving an injury.

At Mr. Giblin's jury trial, the first three witnesses called by the State were Mr.

Eteuati and two other individuals who had been traveling in the vicinity of the BMW and

the Tesla for 10 or 15 minutes leading up to the collision.  Their testimony was largely

damaging to the defense.

During a break following most of Mr. Eteuati's direct testimony, the State moved

to prevent cross-examination about a statement Mr. Eteuati volunteered during a

telephonic interview with a detective.  Referring to a transcript of the taped interview, the

prosecutor explained:

> [Mr. Eteuati] volunteered . . . that "I honestly believe, sir, his intention was
> to hit the vehicle and drive off.  But didn't realize the guy was between
> both cars, you know.  It might have been an accident, but it was still like
> wrong, man."
>     The detective responded with, "Right.  So you believe his intention
> was to hit the car?"

4

[Mr. Eteuati's] Answer: "Correct. Yes, I don't think his intention was to crush the guy, you know."

RP at 131-32.

The prosecutor told the court that later in the detective's interview of Mr. Eteuati, the detective asked, "Could you see if the driver of the first car, the BMW, was looking when he backed up at all or could you tell?" and Mr. Eteuati's answer as recorded in the transcript is "Honestly, I don't—I don't think I was. I mean, honestly, sir, I don't think he . . . ." RP at 132. The prosecutor told the court that when interviewed by the defense, Mr. Eteuati indicated he did not see Mr. Giblin look back while driving in reverse but Mr. Giblin could have been looking in one of his mirrors. Summarizing, the prosecutor said, "I believe that the witness doesn't know. In other words, conceivably it could have been happening, but he doesn't know." *Id.*

The prosecutor told the court that when she asked Mr. Eteuati for the basis of his belief that Mr. Giblin did not intend to hit Abel, "[H]e didn't see anything." RP at 133. She said she was clear with Mr. Eteuati that she needed to know if his statement was "based upon something you saw and observed," but "he has no idea. He simply has no idea." *Id.* The prosecutor posited that Mr. Eteuati's belief could come "frankly from his desire or wish that that would be the case." RP at 132.

When defense counsel responded, she did not dispute the prosecutor's characterization of Mr. Eteuati's statements when interviewed. She argued, however,

5

that Mr. Eteuati's statements "go[ ] to his state of mind," and since he made "fairly clear statements" about what he "honestly believ[ed]" "that's monumental to the issues in this case and Mr. Giblin's defense and his right to a fair trial." RP at 134.

The trial court granted the motion to exclude Mr. Eteuati's statements about Mr. Giblin's intent, explaining, "Not only does he lack any personal knowledge that could inform him of that, I also think that would be an improper comment on the defendant's guilt and it invades the province of the jury." RP at 135. The court told the parties it would allow the defense to inquire whether Mr. Eteuati knew if Mr. Giblin looked in his mirror or saw anything behind the BMW.

When Brian Loredo later testified, the State touched on the defense theory that Mr. Giblin put his BMW in reverse accidentally, asking the following questions and getting the following responses:

> [Prosecutor:] Was there anything about the way or the manner in which the car backed up that gave you any concern for it being out of control or inadvertent or—
>
> [Brian:] Well, it just kept going.
>
> [Prosecutor:] What do you mean?
>
> [Brian:] Um, well, you know, if you—I guess if somebody—to me there was no question as far as the intent.
>
> [Prosecutor]: Why do you say that?
>
> [Defense Counsel]: I'm going to object, Your Honor. It's a statement on the ultimate issue.
>
> [Prosecutor]: Asking for his opinion based upon what he observed.
>
> THE COURT: I'm going to overrule the objection. You can answer.

6

[Prosecutor:] Based upon what you observed, why do you think that?

[Brian:] Because, you know, the car if you—let's say somebody accidentally puts a car reverse, you know, when you step on the gas, once you realize—I've done it before. I've done it. In my car it's weird because the way the handle is, it's not a shifter. I've done it several times in my car. As soon as I've done that, I know to stop. But it just seemed that there was no intent to stop. It just kept going and kept going and kept going until it hit my car.

RP at 266-67.

Mr. Giblin's teenaged son was called as the last witness in the State's case and provided testimony largely supportive of his father. In the defense case, Mr. Giblin testified on his own behalf. The defense conceded that Mr. Giblin was guilty of failure to remain at an accident but vigorously denied that he intentionally put his car in reverse or intended to hit Abel.

The jury found Mr. Giblin guilty of first degree assault and failure to remain at the scene of an accident.[3] The court imposed a total sentence of 136 months, the high end of the standard range for the assault count. Mr. Giblin appeals.

ANALYSIS

Mr. Giblin assigns error to the trial court's exclusion of Mr. Eteuati's opinion of Mr. Giblin's intent, and its overruling his objection to Brian Loredo's opinion of his intent. Among his arguments is that "[i]f the Court felt the opinion of Brian Loredo was

---

[3] It also found him guilty of the lesser included charge of second degree assault, which the court dismissed.

admissible . . . it should have also admitted the opinion of Mr. Eteuati. . . . The Court should have allowed either the opinion testimony of both Mr. Eteuati and Brian Loredo or neither." Br. of Appellant at 12.

Under ER 701, a lay witness may testify "in the form of opinion or inferences" that are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704. Nonetheless, "there are some areas that are clearly inappropriate for opinion testimony in criminal trials." *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). "Among these are opinions, particularly expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses." *Id.* (citing *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)). "[T]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, [which] is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." *City of Seattle v. Heatley*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993).

A ruling on the admissibility of opinion evidence is reviewed for abuse of discretion. *Demery*, 144 Wn.2d at 758. A trial court abuses its discretion when its ruling is based on untenable grounds or reasons. *State v. Quaale*, 182 Wn.2d 191, 196-97, 340

P.3d 213 (2014). "Where reasonable persons could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion." *Demery*, 144 Wn.2d at 758.

It should go without saying that if one party is allowed to offer the lay opinion of a witness on a particular issue, it does not follow that the other party is automatically entitled to offer a conflicting lay opinion. The admissibility of each is determined under the evidence rules. And here, the opinions of Mr. Eteuati and Brian Loredo involved different issues. Mr. Loredo testified to his belief that Mr. Giblin was knowingly, not accidentally, driving backward. He was not asked about nor did he express a view on the specific intent element of first degree assault: whether Mr. Giblin "acted with intent to inflict great bodily harm." Clerk's Papers at 132 (Instruction 9).

Specific intent is exactly what was addressed by the opinion of Mr. Eteuati that the defense wished to offer. On the issue of whether Mr. Giblin knowingly drove in reverse, Mr. Eteuati *agreed* with Mr. Loredo; in his recorded statement, he said, "I honestly believe, sir, his intention was to hit the vehicle and drive off." RP at 131. The different opinion that the defense wished to offer was Mr. Eteuati's opinion that, "I don't think his intention was to crush the guy." RP at 132.

There was a lack of foundation for Mr. Eteuati's opinion on the issue of Mr. Giblin's specific intent. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the

matter." ER 602. When it comes to a lay witness's opinions, ER 701 requires that they be "rationally based on the perception of the witness." And when an opinion relates to a core element that the State must prove, there must be a *substantial* factual basis supporting the opinion. *State v. Farr-Lenzini*, 93 Wn. App. 453, 463, 970 P.2d 313 (1999). Mr. Eteuati was driving on an interstate highway, at the speed limit, when he witnessed a sudden collision. He could not articulate anything he observed that provided a basis for his belief that Mr. Giblin did not intend to hit Abel. Frankly, the trial court would have abused its discretion had it admitted Mr. Eteuati's opinion as to Mr. Giblin's specific intent.[4]

There was no abuse of discretion in overruling the objection to Brian Loredo's testimony. Brian was in the immediate vicinity of the collision and articulated a rational basis for his belief, based on what he observed, that Mr. Giblin did not accidentally drive backward. Whether or not Mr. Giblin knowingly drove backward was not an ultimate fact but it was a clearly relevant fact, and it was reasonable for the court to allow opinion testimony that would be helpful to a clear understanding of Brian's observations. "The fact that an opinion supports a finding of guilt . . . does not make the opinion improper." *State v. Collins*, 152 Wn. App. 429, 436, 216 P.3d 463 (2009).

---

[4] On appeal, Mr. Giblin does not rely on his trial lawyer's argument that Mr. Eteuati's opinion "goes to his state of mind." RP at 134. Mr. Eteuati's state of mind was irrelevant.

No error or abuse of discretion is shown.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Giblin raises nine. RAP 10.10 permits a defendant to identify and discuss matters related to the decision under review that he or she believes have not been adequately addressed by the brief filed by counsel.

We generally will not review errors that are raised for the first time on appeal. RAP 2.5(a). We will not consider contentions in an SAG that do not inform us of the nature and occurrence of alleged errors. RAP 10.10(c). We are not obligated to search the record in support of claims made in an SAG. *Id.* Only documents that are contained in the record on review should be relied on. *Id.* Issues that involve facts or evidence not in the record are properly raised through a personal restraint petition (PRP), not an SAG. *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

With that introduction, we turn to the additional grounds raised by Mr. Giblin.

*Concealment and suppression of evidence*. Mr. Giblin contends the State concealed and suppressed evidence that Abel was actively on probation for driving under the influence and that Brian had violated parole, was actively on probation, and did not have valid insurance at the time Mr. Giblin struck his vehicle. Mr. Giblin argues that these are crimes of dishonesty that call into question the Loredo brothers' credibility.

11

Our rules of evidence govern the admissibility of evidence of a witness's character, prior bad acts, and credibility. *See* ER 404, 405, 608, 609. Mr. Giblin identifies no basis under which the matters he identifies would have been admissible at trial. If some of the matters he identifies should have been disclosed under CrR 4.7—and he does not show that they should have been—he does not identify that their nondisclosure caused any harm.

The record reveals that the State did disclose a couple of prior convictions of the Loredo brothers and uncertainty as to whether there might be another. The convictions or possible convictions either were not admissible under the evidence rules, or the defense never presented the proof required to admit them.

*Ineffective assistance of counsel.* Mr. Giblin contends he received ineffective assistance of counsel because his trial lawyer failed to seek out and present additional evidence that would have benefited his defense, failed to adequately and aggressively cross-examine the State's witnesses, failed to adequately prepare for trial, failed to discuss and review the charges with Mr. Giblin, failed to pursue a plea bargain, and failed to inform Mr. Giblin that he could terminate the lawyer's representation.

To demonstrate ineffective assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a

reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Complaints about performance cannot be entertained if the lawyer's conduct "can be characterized as legitimate trial strategy or tactics." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

We will not review the contention that Mr. Giblin's lawyer failed to adequately and aggressively cross-examine witnesses because he fails to identify where in the record the deficient cross-examination allegedly occurred. All of his other complaints depend on facts outside our record and are susceptible to relief only through a PRP, supported by relevant evidence.

*Witness coercion and tampering.* Mr. Giblin contends that Jeannette Bowers, a witness for the State, was coerced, tampered with, and coached; he bases his belief on the level of detail in her trial testimony, which he claims went beyond that included in her written statements. He also contends the State provided her with statements from his interview that she testified about as her own. Neither Ms. Bowers's written statement nor Mr. Giblin's interview are included in the record on appeal. If Mr. Giblin believes he can demonstrate misconduct on the part of the State that would entitle him to relief, he must seek it through a PRP, supported by evidence.

*Judicial bias.* Mr. Giblin asserts the trial judge sustained numerous objections by the State and prohibited ER 404(b) evidence damaging to the Loredo brothers. Because

13

he fails to identify the objections he contends were wrongly sustained and fails to provide any authority or argument why the court's ruling on those objections and ER 404 issues were in error, he is not entitled to review. *And see In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004) ("Judicial rulings alone almost never constitute a valid showing of bias.").

*Intent evidence and intent as argued by the State*. Mr. Giblin challenges the admissibility of intent evidence presented by the State, based on *Beck v. Dye*, 200 Wash. 1, 92 P. 1113 (1939). *Beck* addresses the excited utterance exception to the hearsay rule and the fact that one requirement for an excited utterance is that it be a statement of fact, not opinion. The case has no apparent application to this case. Additionally, Mr. Giblin does not identify the specific evidence offered by the State that he challenges, as required by RAP 10.10(c).

*Statements by Abel's girlfriend*. Mr. Giblin contends that when Abel was interviewed by police, his girlfriend improperly responded to questions directed to Abel and expressed her opinion. While Mr. Giblin is not required to provide citation to authorities, he is required to identify the nature of an alleged error. RAP 10.10(c). Even if Abel's girlfriend's actions interfered with the interview, Mr. Giblin provides no reason why this would be error entitling him to relief.

*Failure to interview Mr. Giblin or his son*. Mr. Giblin complains that the Washington State Patrol failed to interview him or his son before a declaration of

14

probable cause was prepared by the Pierce County prosecutor's office. Here too, Mr. Giblin provides no reason why the Washington State Patrol's choice not to interview him or his son would be error or entitle him to relief.

*Offender score*. Mr. Giblin argues that as a first time offender, his offender score should have been 0. The determination of an offender score can take into consideration both prior and current convictions. Mr. Giblin was sentenced for two current offenses, so each counted as 1 point toward the other. *See* RCW 9.94A.589(1)(a). There was no error.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____       _____
Korsmo, J.                                          Fearing, J.